THE STATE *ex rel.* BELL, *Appellant*, v. THE S̤T. LOUIS CLUB.

Division Two, December 4, 1894.

1. **Dramshop Law:** INCORPORATED CLUB. An incorporated club is not a "person" within the meaning of the dramshop act regulating the sale of intoxicating liquors and requiring a "person" to take out license as a dramshop keeper.

2. ———. The sale of liquor by a *bona fide* social club not incorporated for profit, to a member, is not a sale within the inhibition of the dramshop law.

*Appeal from St. Louis City Circuit Court.*—HON. L. B. VALLIANT, Judge.

AFFIRMED.

*Leverett Bell, S. S. Bass* and *William Zachritz* for appellant.

The sale or traffic in liquor in Missouri in quantities of less than three gallons is regulated by statute and is required to be carried on under a license first had and obtained for the purpose, and known as a dramshop license. The business can not be pursued except in conformity with law. If one is a corporation and is for this reason excluded from the class of persons to whom dramshop licenses are issued, it must abstain from the business. This statute is to be observed, not evaded. The business of the defendant in dispensing liquor at its club requires a dramshop license, and can not otherwise lawfully be prosecuted. 1 R. S., p. 723, sec. 2835; Laws of 1891, p. 128; *State v. Club*, 44 Mo. App. 86; *Newark v. Club*, 53 N. J. L.

99; *People v. Soule*, 74 Mich. 250; *United States v. Whittig*, 2 Lowell, 466; *People v. Andrews*, 115 N. Y. 427; *State v. Neis*, 108 N. C. 787; *State v. Club*, 73 Md. 97; *Club v. Louisville*, 17 S. W. Rep. 743; *Club v. State*, 10 S. Rep. 574; *State v. Boston Club*, 12 S. Rep. 895.

*A. & J. F. Lee* for respondent.

(1) The act under which the relator claims title to his office is unconstitutional in that it states no fixed term for his office. Session Acts, 1893, p. 149, sec. 1; R. S. 1889, p. 93, sec. 14. That act is unconstitutional, because it is special legislation. *Murnane v. St. Louis*, 123 Mo. 479. (2) The statutes of this state do not forbid an association incorporated under the acts governing the incorporation of religious, benevolent and educational associations for the purpose of maintaining a clubhouse from dispensing liquor in the manner set forth in the agreed state of facts in this case. Such associations are not, and for the past forty-three years have not, been classed as dramshop keepers nor regulated by the law regulating dramshops or saloons. Session Acts, 1891, p. 128, secs. 1, 2, 4, 8, 21, 28; *Graff v. Evans*, L. R. 8, Q. B. Div. 373; *Commonwealth v. Pomphret*, 37 Mass. 564; *Commonwealth v. Ewig*, 145 Mass. 121; *Seim v. Maryland*, 55 Md. 566; *Club v. Dwyer*, 11 Lea, 452; *Club v. Commonwealth*, 87 Va. 541; *State ex rel. v. McMaster*, 14 S. E. Rep. (S. C.) 290; *Borden v. Club*, 25 Pac. Rep. 1042; 11 Am. and Eng. Encyclopedia of Law, p. 727; Black on Intoxicating Liquors, sec. 142, p. 185; *Koenig v. State*, 26 S. W. Rep. 835; Bouvier's Law Dic., Retailer; Session Acts, 1840-1841, p. 82; R. S. 1845, p. 542; Session Acts, 1851, p. 56; R. S. 1855, p. 379; Session Acts, 1891, p. 131, sec. 21; R. S. 1855, p. 683, sec. 28; R. S. 1889, secs. 2822, 2829, 6569.

GANTT, P. J.—The circuit attorney of the eighth judicial circuit, on October 12, 1893, filed in the circuit court of the city of St. Louis, an information in the nature of a *quo warranto*, substantially in the following terms:

The relator states that he is the excise commissioner of the city of St. Louis, duly appointed by the governor of this state, under and pursuant to an act of the general assembly entitled, ''An act to create the office of excise commissioner,'' etc., approved March 17, 1893, and that he has exclusive authority to grant dramshop licenses in said city.

That the respondent is a corporation duly organized under article 10 of chapter 42 of the Revised Statutes of the state of Missouri, and that it has, during the six months preceding the filing of this petition, continuously, and every day, including Sundays and holidays, at its premises in the city of St. Louis, on the corner of Locust street and Ewing avenue, sold intoxicating liquors in quantities less than three gallons, which were drunk on said premises, without being licensed as a dramshop keeper, and in violation of the laws of Missouri, and of an act of the general assembly entitled, ''An act to regulate the sale of intoxicating liquors in the original packages or otherwise,'' approved April 20, 1891.   Laws of 1891, p. 128.

The relator prays that the above unlawful acts may be inquired into, and that judgment of forfeiture of respondent's charter may be had, and such other relief granted in the premises as is proper, and costs.

The court ordered the respondent to plead to the information on a day named, which it accordingly did by filing an answer, averring the facts set out in the following stipulation:

''It is stipulated in this case that the following are

facts: The respondent is a corporation, organized November 25, 1878, under that part of article 8, chapter 37, of the Revised Statutes of this state, and the laws amendatory thereof, in force at that date, concerning the incorporation of benevolent, religious and educational associations; that said organization was made, and has since been continued, for the purpose of forming and maintaining a club; that said club should obtain and maintain a clubhouse for the purpose of advancing, by social intercourse, the bodily and mental health of such persons as might be, or thereafter become, its members, and by the friendly interchange of views and discussion advance the commercial prosperity of the city of St. Louis and obtain a place of common and friendly intercourse of such members with each other; that in order to carry out these purposes respondent, immediately after its incorporation, obtained and has since maintained a clubhouse in said city, said clubhouse having been for the eight years last past at the corner of Locust street and Ewing avenue, in St. Louis, the premises described in the information; that it has kept at all times in said clubhouse spirituous liquors, and said respondent has never had a license to sell liquors from either the city of St. Louis or the state of Missouri, as provided by the dramshop law of the state or the ordinance of the city; that at all times the membership to said club has been limited to four hundred resident members and one hundred and fifty nonresident members; that the actual membership for the year preceding the institution of this suit averaged three hundred and sixty-three resident members and never exceeded four hundred, and averaged about sixty nonresident members and never exceeded seventy-five; that no person was permitted to become a member of the club until he was proposed for membership by a member, and the proposal recommended by two other

members of the club, nor unless he was a man of good moral character, twenty-one years of age or over, and not more than one of its board of governors, which board consisted of nine of its members, should, on a vote taken on his admission, have voted against him; and if he desired to become a resident member, it was necessary that he should be personally known to at least one member of its board of governors. Persons becoming resident members were required to pay $100 an initiation fee, and $80 thereafter annually; nonresiment members were required to pay a $50 initiation fee and $30 annual dues; officers of the army and navy of the United States were elected members in the same manner and upon the same qualifications, except the qualification as to residents, and they were relieved from the payment of an initiation fee. No one could become a nonresident member who did not reside fifty miles or more from the city of St. Louis. The names of persons submitted for membership were at all times subject to investigation and report by a committee on membership, and applicants have been refused admission to the club; all citizens of St. Louis possessing the qualifications above stated to be required of resident members, within the limit of the number above set forth, were qualified to become members of the club.

"The clubhouse is a large building, for which the club pays an annual rent of $5,600, all the taxes, insurance and repairs; it was furnished at the expense of the club, and contains reception rooms, dining rooms, card rooms, billiard and pool rooms, a tenpin alley, kitchen, storerooms, and bedrooms for employees. There is no place to which the members can resort and be directly served with wine or liquor by the person having the custody thereof, but there is on the first floor of said building a wine room, and in the basement

a wine cellar in which stocks of spirituous liquors are kept. At any time, within a year before the institution of this suit, that a member desired to obtain any wine or liquor less than one gallon kept in either stock, he gave his order to a servant of the club, and the servant obtained such wine or liquor from the person having the custody thereof, and served him with the quantity desired; on receiving the wine or liquor, the member was required to sign a card acknowledging the receipt of the wine or liquor, and its price. The rules of the clubhouse forbid any payment to any person serving wine or liquor, and the practice was that the price of the wine or liquor was charged against the account of the member so ordering it, and generally paid by him, in by far the greater number of instances by a check on a bank, but occasionally in cash, within the first ten days of the succeeding month, although there were some instances in which members paid to the clerk of the club said price within the day upon which they received such wine or liquor. In the same manner wine and liquor were served to members in the dining rooms and to their guests, but no charge was made against any guest, nor was he permitted to pay anything on account of said wine or liquors, unless such guest was also a member of the club. Said wines and liquors when so served were consumed within the clubhouse, and were so dispensed, and not otherwise, daily during the six months preceding the filing of the information, and with or without meals.

"The proceeds derived from said wines and liquors were placed with the other money of the respondent, and expended in repurchase of other wines and liquors and in the maintenance of the club; that no profit has ever been declared or paid to any of its members by the respondent since its organization, but the annual dues and initiation fees have all been consumed in

establishing and maintaining the clubhouse; that the respondent has maintained in its clubhouse at all times dining rooms fully equipped, in which were furnished meals for its members or their guests; a reading room in which were kept a large number of current newspapers and periodicals; bowling alleys and a billiard or pool room fully equipped, all for the use of its members and such of their guests as received cards of admission as hereinafter stated, and the same were much used by them; that the clubhouse was used by many of its members as a home, except for sleeping purposes, there being no sleeping rooms therein for the use of members or guests; that said guests, except as hereinafter stated, were in every instance persons residing more than fifty miles from said city, and no member of the club was permitted or did have more than three guests admitted to the club at any one time, nor was any one of said guests admitted to said club at any time without a special card of admission, or for a period of more than two weeks in a year, except that the board of governors had authority to extend a card of invitation to any guests for a period of two weeks in addition; that the number of guests entitled to enter said clubhouse under said cards of admission at any one time has not been on the average above twelve, but persons resident in said city not members of said club were only permitted to enter the clubhouse as follows:    Any person calling to see a member of said club was permitted to enter the clubhouse and proceed directly to a room known as a reception room, and there await the member whom he desired to see, and thereafter on leaving said reception room leave the clubhouse; that no wines or liquors were served in said reception room; that upon invitation of any member any male person was permitted to enter said club and proceed directly to a private dining room,

provided said member was at that time giving a dinner of which he was partaking in said private dining room, but after said dinner was finished, such person was required to leave the clubhouse. On Thursday of each week the female friends of the members were permitted to attend private entertainments in said private dining room in the same manner.

"Said clubhouse has not been maintained at a profit, or for the purpose of deriving a profit therefrom, nor were said wines or liquors ever served for the purpose of deriving a profit therefrom, but as an incident to the maintenance of said clubhouse; musical entertainments of the highest order of excellence have been given at times in said clubhouse to the members of the club, and the female members of their families, for admission to which no charge was made or received; many of the members resort to said clubhouse for the purpose of recreation, and the same is kept open from 7 o'clock in the morning until midnight on each day of the week. The total number of persons employed and paid by said respondent, and who were all necessary for the maintenance of said clubhouse, has been at all times thirty-eight, consisting of a steward, two bookkeepers, waiters, cooks and other servants. The affairs of said respondent have been controlled by said board of governors, and its employees have been employed and discharged by said board. Said board consists of a president, three vice-presidents and five directors; said respondent had also a secretary, by whom a record of all the meetings of its members and board of governors have been regularly kept, and said meetings have been regularly held. It had also a set of by-laws, in accordance with which its said affairs have been conducted. It is admitted that the relator has been commissioned by the governor of the state of Missouri as excise commissioner of the said city of St.

Louis as provided by the law of this state, approved in the year 1893, and is in possession of and exercising the functions of the office. It is agreed that the wines and liquors so dispensed annually aggregate in value to a sum in excess of $10,000. Proof may be made of any further facts not inconsistent with the facts stated above."

In addition to the above facts, the respondent offered to prove that it at no time sold or disposed of spirituous liquors at a profit or at a price in excess of the actual cost of the liquor with the cost of service added, which proof was excluded as incompetent and irrelevant on objection of plaintiff's counsel.

The court gave judgment for defendant, and a motion for a new trial was in due time made and overruled and an appeal granted to this court.

The contention of the excise commissioner is that the club, under the agreed statement of facts, has forfeited its charter, whereas the respondent club insists that the dramshop act has no application to it; that it is excluded by the terms of the statute from taking out a dramshop license, and that it is not selling liquors within the meaning and prohibition of the statute.

The prosecution of clubs for furnishing liquors to their members is not a new thing. The cases are numerous and irreconcilable. In those states where the laws are prohibitory, as might be expected, a most rigid line of adjudication is to be found. On the other hand, where the enactments on this subject have been in the main police and revenue regulations a less stringent line of decisions has been rendered. In each jurisdiction, the courts have been governed by the statutes themselves, and have endeavored to construe them so as to effectuate the intention of the legislature. A marked feature, moreover, in all these cases, is the effort to prevent evasions of the statute by tricks and

devices which attempt to assume a legal form while really violating the spirit of the statute. These have rightly been swept aside by the courts without hesitation.

The article on this subject in the American and English Encyclopedia of Law, volume 11, page 727, summarizes the matter in these words:

"The distribution of liquors by a *bona fide* club among its members is not a sale within the inhibition of a liquor law, even though the person receiving the liquor give money in return for it.  *  *  *  It is otherwise, however, where such club is simply a device resorted to as a means of evading the statute."

Save in those counties and cities which have adopted "local option" in this state, the dramshop law of Missouri has not been a prohibition law, but its purpose has been to regulate the sale of intoxicating liquors by providing for orderly houses and to derive revenue therefrom. Indeed, it is one of the chief sources of revenue in many cities. The definition of a dramshop keeper and the provision against the sale of liquors without license have remained practically the same since 1841. Acts, 1840–1, p. 82; R. S. 1845, p. 542; R. S. 1889, sec. 4569; Laws of Missouri, 1891, p. 128.

"A dramshop keeper is a person permitted by law, being licensed according to the provisions of this chapter, to sell intoxicating liquors in any quantity, either at retail or in the original package, not exceeding ten gallons." Laws, 1891, p. 128, sec. 1.

The "person" obtaining the license must satisfy the court that he is a law-abiding, assessed, taxpaying male citizen above twenty-one years of age.

We think it is obvious that the legislature never intended that a corporation should be licensed under this act as a dramshop keeper. "Person" as used in this act does not include a corporation, because the

whole context is repugnant to such a construction. R. S. 1889, sec. 6569. The criminal provisions of the statute also evidently point to a "person," who is amenable to the punishment under our criminal laws and the provisions therein for enforcing fines and penalties.

Under its charter the defendant club maintains its dining rooms and reading rooms on Sunday as well as all other days of the week. Even if it could take out a license as a dramshop keeper, it would necessitate the closing of the establishment on Sunday, and thus deprive its members, who are active business men, and unmarried, of one of the chief motives in membership, in affording them for one day the quiet and retirement from the noise and bustle of a public hotel. Under its charter the club has furnished its rooms with musical instruments, billiard tables, bowling and tenpin alleys. If required to take out a license it must dispense with all these appliances that add to the comfort and health of its members. Indeed it is at once apparent that the appointments of a clubhouse, maintained after the manner of defendant's, are entirely different from those of a barroom or dramshop in this state, and a club can not be maintained under the provisions of the dramshop act. It results, then, that, if the excise commissioner is correct, it must either surrender its charter or deny its members the use of intoxicating liquors as refreshments.

The facts of this case remove it entirely from that class in which the club was used as a mere scheme to sell liquor in defiance of law. In those cases the prime object and purpose was the sale of liquor and the club was a mere evasion of the law; in this case the use of wine and liquor, as shown in the agreed case, was a mere incident, subsidiary to the higher and chief purpose of the association, to wit, the advancement by social intercourse of the bodily and mental health of its

members. There was no common bar to which any or all of the members or any stranger could repair at any time and order a drink or drinks and pay the barkeeper therefor. Such a place would have been entirely out of harmony with the other surroundings and regulations. The rooms were open once a week to ladies, and musical entertainments of a high order had been given in the rooms. In many of the cases the transparent fraud in the club was that its pretended membership could be attained for the paltry price of a drink, and no other qualification was needed or desired, than that the applicant should have sufficient to pay for it. Manifestly those cases can have no application to a club like this, which in a city of over a half million inhabitants is limited in its membership to four hundred residents. Nor can the qualification of admission into the one bear the slightest resemblance to the other. In this case not only is the membership limited, but the applicant must not only be vouched for and not meet the disapproval of two of the governors, but he is subject at all times to be excluded if he fails to observe and maintain the standard. The initiation fee is $100 and the annual dues $80.

It is out of the question to attribute to this club and its members any intention to violate the dramshop law, but the question remains, have they violated the law and forfeited their charter in so doing, *although unintentional*, because if they have, they are none the less amenable. "*Ignorantia juris neminem excusat*" is a maxim that must be applied in the administration of excise and liquor laws. *Beckham v. Nacke*, 56 Mo. 546.

Applying the test that commends itself to our best judgment, in view of the conflict in the decisions, we think that where a social club as in this case is clearly a *bona fide* organization, with a limited membership,

and admission into which can not be obtained by any person at his pleasure and its property is actually owned in common by its members, a distribution of wine or other liquors belonging to such club, among its several members, is not a sale of liquor by retail or in original packages within the meaning and purview of our dramshop act, although technically the act does amount to a sale for some purposes. The *bona fides* of the organization is in each case a question for the court or the jury under proper instructions of the court.

As this case is one of first impression in this court, an examination of cases in other jurisdictions seems appropriate. They will be found collated in Black on Intoxicating Liquors, section 142, and notes. The leading case which holds the dispensing of liquors, under the circumstances stated in the agreed case, is not a sale under the revenue laws of England, is *Graff v. Evans*, L. R. 8 Q. Bench Div. 373.

The appellant in that case was the manager of an institution carried on *bona fide* as a club, under rules by which its members paid an entrance fee and subscription. Trustees were appointed in whom all the club property was vested and there was a committee of management to conduct the general business. The club was not licensed for the sale of intoxicating liquors, but these were supplied at fixed prices to members for consumption on and off the premises, thirty-three per cent. above the cost price being charged, and the money going into the general fund. The appellant, the manager, having supplied intoxicating liquor to a member, who paid for it, was convicted and adjudged to pay a penalty of twenty shillings. On appeal, this conviction was reversed. The transaction was held not to be a sale within the English licensing act; that the member of the club receiving

the liquor was a co-owner with all the other members and the transaction was a mere transfer of the special property of the other members to him, and not a sale.

In *Commonwealth v. Pomphret*, 137 Mass. 564, the club was organized, but not incorporated, with a select, limited number of members, duly elected officers, the purpose being to furnish refreshments to those who belonged to it. A salaried steward was employed. One dollar was charged for admission, and checks were sold at five cents apiece. It was held that buying the liquor and distributing it among the members was no violation of the statute. The court says: "One inquiry always is whether the organization is *bona fide* a club with limited membership, into which admission can not be obtained by any person at his pleasure, and in which the property is actually owned in common." The court follows *Commonwealth v. Smith*, 102 Mass. 144.

In *Commonwealth v. Ewig* (1887), 145 Mass. 121, there was a conviction for selling liquor, which was sustained. The instructions given by the court below were held correct. The statute under which the conviction was had is not quoted in the decision. It was apparently chapter 100, page 524, of statutes of Massachusetts of 1882, section 1: "No person shall sell, or expose, or keep for sale, spirituous or intoxicating liquor, except as authorized in this chapter."

The club had four hundred members, officers, a steward, $1 initiation fee; a card of admission was given to each member. The proceeds were used in buying liquors in the name and as the property of the club. Zinc checks were given the members on their paying for them, which were received for liquors. Members only were admitted to the clubrooms. No

others were permitted to partake. Money never passed for beer, but checks only. It was the steward's duty to furnish liquor for checks. One became a member only after "proposal of name and being voted on." Three votes rejected. On joining, the members signed the constitution and paid membership fee. Applicants were rejected. Records of the club, with constitution, by-laws, minutes of meetings, and signatures of members, treasurer's accounts, were offered in evidence, and the zinc checks. The state claimed the organization was a fraud, and the jury must have so found. The instructions were: *First, if the club was bona fide and the liquors owned by it, the distribution among the members did not constitute a sale within the meaning of the statute; second,* "If two or more persons unite in buying intoxicating liquor and then distribute it among themselves, they do not violate the statute, and the intent with which they do this is immaterial. If they intend in this manner to obtain intoxicating liquor to drink without thereby subjecting any person to the penalties of the statute, they still act with impunity. It is not a violation of law if they unite in good faith in dividing it. If two persons buy a gallon of liquor, and divide it among themselves, they act with impunity; but if this is a mere device to cheat the government out of its license fee, and prevent the due execution of law, it is not a protection, and the defendant does not act with impunity."

In *Seim v. State,* 55 Md. 566, the club was incorporated under a general law. The statute provided: "No person in this state shall sell, dispose of, barter, or if a dealer in any one or more of the articles of merchandise in this section mentioned, shall give away, on the Sabbath day * * * any * * * spirituous * * * liquors." The indictment was for selling.

The association pays $1,200 taxes, $1,100 insurance, $2,500 ground rent. The court says:

"After a careful consideration of the facts set out in the agreed statement, we are all of opinion that the transaction was not *a sale* of beer   *   *   *   within the intent and meaning of the act of 1866.   *   *   *   It will be observed that the license laws   *   *   *   which forbid the sale or barter of spirituous or fermented liquors without a license, have never been construed as applicable to *social clubs*   *   *   *   where liquors are procured for the use of the members, and are furnished to them in the manner described in the present case; and we think it very clear that no license is required, for the reason that such a transaction is not a *sale* within the meaning of the license laws. And by a parity of reason, we conclude that the members of such associations   *   *   *, who obtain refreshments and liquors at the club, by paying into the common fund the price fixed by the regulation of the society, can not be said in any sense to buy them from the corporation, nor can the corporation be said to *sell* them to the members, within the meaning of the act of 1866.   *   *   *   The society is not an ordinary corporation; but a voluntary association or club united for social purposes,—each member must be elected, and each is joint owner of the property and assets, and entitled to the privileges of the society as long as he remains a member. Among these privileges is that of partaking of the provisions and refreshments provided for the use of the members. These are not *sold* to him by the corporation, but furnished to him by the steward, upon his paying into the common fund what is equivalent to the cost of the article furnished, and what is so paid is expended in keeping up the supply for the use of the members. Such a transaction is not a barter or sale in

the way of trade, and therefore not within the purview or meaning of the act of 1866.''

In *Tennessee Club v. Dwyer* (1883), 11 Lea, 452, the club was incorporated and authorized to maintain a club for social enjoyment.   No profit was to be made. It was to give musical entertainments.   It was used by some as a home, except as lodgings, and some of the members spent much time there every day.   The statute provided that retail liquor dealers should be taxed as other merchants.   The court comments on the case of *Martin v. State*, 59 Ala. 34, and says:   ''The question (there) seems to have turned entirely upon whether or not the facts of that transaction constituted a *sale*, and it was held that they did.''   The court goes on to say:

''We think it is clear from the statements of the bill, that the mode of sale, as it is termed, to the members at a rate fixed by the governing committee of the club, is only in fact an equitable and convenient mode of distributing refreshments to its members, which are provided by the club for them exclusively.   It can not be controverted but that the complainant would have a right to purchase and keep liquors at its clubrooms for the use of its members, and to distribute it among them in any method it might deem proper, and to raise funds for the purpose of replenishing by assessments upon the members, and the mode adopted of the form of a sale alone to its members of such a quantity for so much  money,  can  be  nothing  more  than  a  mode adopted of assessing each member in proportion to the amount he consumes, and can not be distinguished in principle from that adopted in one of the cases referred to, of issuing checks to each member, which entitles him to so much liquor each, according to the amount of money he contributes.''

In *Piedmont Club v. Commonwealth* (1891), 87 Va.

541, the appellant was a club incorporated in good faith. The prosecution was under a statute which provided: "No person, corporation, company, * * * shall * * * engage in the business of rectifying, * * * or sell, or offer to sell," ardent spirits. "Any person * * * desiring to carry on the business of a retail liquor merchant, and also that of a barroom, shall obtain a separate license for each." The court says: "The case depends upon the true construction of our own statute, and we are clearly of opinion that if in the present case there can be said to have been, in the strictest or most technical sense, a sale at all, it was not such a sale as is contemplated by that statute. The defendant club, in dispensing liquors to or at the expense of its own members, was not engaged in carrying on the business of selling liquor, and liquor license is required of those persons only who sell or offer to sell liquor as a business." The authorities were all reviewed.

In *State ex rel. v. McMaster* (1892), 14 S. E. Rep. (S. C.) 290, the club was incorporated in good faith. Its rooms were situated in the city of Columbia, used exclusively by the members, and intended to prepare for them a place where they at small cost could have and enjoy the privileges and privacy of a well conducted home, together with such amusements as were consistent with the rules and objects. It maintained a library and reading rooms. The court says: "The cases seem not to be in accord. We have examined many of them in the hope of being able to reconcile them, but have found it impossible to do so. We think, however, that much of the seeming conflict arises from two causes: *First,* where the alleged club, as a matter of fact, is not *bona fide* what it purports to be, but is a mere device to evade the law against retailing liquor without a license. In all such cases, of course, they

are liable. And, *second*, from the difference in the terms of the various acts upon the subject, each court construing for itself the laws and regulations of its own state."

The law of South Carolina seemed to recognize two kinds of licenses. One used in some kinds of business, called "a business license," and the other to retail liquor, called "a liquor license." The statute declares that no license for the sale of spirituous liquors shall be granted in South Carolina outside of the incorporated towns, and it shall be unlawful for any person or persons to sell such liquors without a license. The proper municipal authorities of all incorporated cities, etc., shall have power to grant licenses to retail spirituous liquors, etc., to keep eating houses apart from taverns; the person to whom such license is granted to be first recommended by six responsible taxpayers, and to give a $1,000 bond. "Every person taking out a license for sale of spirituous liquors as aforesaid, shall sell the same in a room fronting the public street, without any screen, curtain, or other device for preventing the passing public from fully viewing what may be transpiring within."

The court continues: "Now, considering these provisions together, what construction should be placed upon them? They are penal in their nature, and should be strictly construed. Is it not perfectly manifest that by the terms used the legislature did not intend to embrace social organizations, such as the Columbia Club, but, on the contrary, that the true intent and meaning of all these provisions was to include only 'the keepers of drinking saloons,' etc.—that is to say, a well known class of persons who are engaged in the business of retailing liquor for a profit, as a livelihood? *Expressio unius est exclusio alterius.*"

The city attempted to tax the sales of the club. The court says: "The question, then, recurs, whether

the regulations adopted by the club for distributing their liquors among their own members 'constitute a sale' in the sense of section 1731 of the General Statutes, which makes it unlawful 'to sell liquors without a license so to do.' As I understand it, the law does not prohibit the use of liquors, but merely regulates the sale  *  *  * . The club owned the liquors, and we suppose that each of its members had the right to use his part of them as he pleased. When he called for his share, or any part of it, and the same was delivered to him subject to account, can we say that was an 'unlawful sale' in the sense of the law? It seems to us that such view is very technical, and that the more reasonable construction is that the regulations of the club amounted substantially to a method of dividing the property among its owners."

*Birden v. Montana Club* (1891), 25 Pac. Rep. 1042: The club was a corporation organized in good faith. The action was prosecuted under a statute providing: "All persons who deal in, sell, or dispose of, directly or indirectly, any spirituous  *  *  * liquors, in any quantity less than one quart, shall, before the transaction of such business, obtain a license." The sales were $40 a day, or $14,600 a year. The court says: "The court below erred in its findings and conclusions that the Montana Club, at the time set forth in the complaint, made sales of intoxicating liquors."

The most recent case that has come under our notice is *Koenig v. State*, 26 S. W. Rep. (Tex.) 835, in which Judge HURT, for the court of criminal appeals of Texas, reviews all the late cases pro and con, and holds, that the club room of a German turnverein maintained in connection with a hall for the usual purposes of such a society and equipped with periodicals, billiard tables, and card tables, for the free use of its members, where intoxicants are furnished without profit to members only, for fees which are turned into the general fund,

is not a house for retailing liquors within the Penal Code of Texas, article 355, which prohibits card playing in such places. He cites with approval the above cases from Virginia, Tennessee, Montana, Maryland and Massachusetts and South Carolina, and the Queen's Bench, in *Graff v. Evans*, and points out that in the *Chesapeake Club v. State*, 63 Md. 446, the local option law was in force, and calls attention to the separate opinion of Judge BRYAN, concurred in by Judges YEL-LOTT and ROBINSON, reaffirming *Seim v. State*, 55 Md. 566, *supra*.

The decision in *State v. Easton Social Club*, 73 Md. 97, was also a construction of the local option law, which absolutely prohibited any person whatever from selling in the county, in which the action arose.

The two cases of *State v. Lockyear*, 95 N. C. 633, and *State v. Neis*, 108 N. C. 787, were likewise decided on prosecutions for violation of the local option law of that state, and the latter was an awkward attempt to evade the statute and was unquestionably correctly decided. So likewise was *People v. Andrews*, 115 N. Y. 427.

*Rickart v. People*, 79 Ill. 85, was a case where the club was held to be clearly a shift or device to evade the provisions of the law. The defendant had been a saloon keeper, and formed a club for the purpose of selling liquor. Any member paying a dollar got a dollar in tickets with figures marked on the margin which were good for cigars, beer, etc., to the amount of one dollar.

In *State v. Mercer*, 32 Iowa, 405, the court says: The scheme of organization was "a rather clumsy device by which the * * * members of the 'social club' hoped to defeat that law."

*Stewart v. Turn Verein*, 71 Iowa, 226, is not in point. It does not appear that the alleged sale was to a member, and the only question considered was, was

the corporation liable for the act of its member who made the alleged sale.

*State v. Horacek* (1889), 41 Kan. 87, was, as Black says, in his work on Intoxicating Liquors, clearly a device. The prosecution was under a statute which provided: "Every person who shall, directly or indirectly, keep  *  *  *  or who shall in any manner aid, assist or abet in keeping or maintaining any club-room or other place in which any intoxicating liquor is received or kept for the purpose of use, gift, barter or sale as a beverage, or for distribution or division among the members of any club or association by any means whatever,  *  *  *  shall be punished." The court held the keeping was harmless, the liquor having been lawfully imported and being interstate commerce, but there was such a disposition of the liquor as was forbidden by the statute.

*State ex rel. v. Bacon Club*, 44 Mo. App. 86, is not in conflict with these views, as it is very evident the club was organized to evade the law, and for no other purpose. No evasion or fraud upon the law can be effectual.

*Martin v. State* (1879), 59 Ala. 34, was under a statute which the court says carefully discriminated between two acts: one, retailing spirituous liquors without a license; second, engaging in the business of retailing liquors without a license, and made both offenses. It forbade not only retailing in the way of business, but retailing not in the way of business. There is no such distinction in our law.

In *Kentucky Club v. City of Louisville*, 17 S. W. Rep. (Ky.) 743, the prosecution was under a city ordinance which provided that "Every clubhouse and clubroom, and every place of resort generally known as such, wherein spirituous liquors are sold by retail  *  *  *  shall pay a license." The intention to tax

the club for pursuing a method such as respondent adopted in this case is too evident to need discussion. So also was *State v. Boston Club* (1893), 20 L. R. A. 185, requiring that club to be licensed.

The cases of *Newark v. Essex Club*, 53 N. J. L. 99, and *People v. Soule*, 74 Mich. 250, are the strongest cases that hold that a transaction like the one in the case before us is a violation of the retail liquor laws of those states, but unfamiliar as we are with the statutes of those states, it yet seems evident, that in Michigan at least a corporation could retail liquors and the question was one simply of taxation.

But it seems to us that inasmuch as this club has been organized since 1878, it is not created for profit and that the legislature must have been cognizant that many similar organizations had been created under the same statute, and if it had been the intention to require them to take out a liquor license it would have made some provision for it, or provided a license tax suitable to the case, as they can not under the dramshop act exercise their other corporate rights. The club has pursued this method of providing refreshments for some fifteen years. Its right seems never to have been challenged before, although the dramshop act has remained substantially the same all these years.

Where the meaning of the law is thus seriously doubted, a proceeding in the nature of a criminal prosecution, which proposes to forfeit defendant's charter, ought to be strictly construed. We are constrained to adopt the view that the club's manner of furnishing its members wines and liquors is not a sale at retail or in original package within the meaning of the dramshop law, and if we are wrong the legislature which is to convene in a few weeks can correct the construction we have placed on the law. The judgment is therefore affirmed. SHERWOOD and BURGESS, JJ., concur.