STATE *ex rel.* WHITTAKER *v.* MOUNTAIN CITY CLUB.*

(*Knoxville.* September Term, 1916).

1. **INTOXICATING LIQUORS. "Public nuisance." Sale. Distribution by clubs.**

Under Laws 1913, Second Extra Sess. chapter 2, section 1, providing "that the conducting, maintaining, carrying on or engaging in the sale of intoxicating liquors, . . . and all means, appliances, fixtures," etc., are declared public nuisances, an incorporated social club which had been in existence for twenty-five years, with a limited membership, dispensed intoxicating beverages to its members at cost of materials and service, without overhead charges, as a mere incident to the main purpose of the club, the social intercourse of its members, no person not a member of the club, being permitted to obtain anything from the club at his own expense, was not guilty of conducting a nuisance, the sale of intoxicating liquors as a business and for profit, being the nuisance contemplated by the legislature. (*Post, pp.* 109-113.)

Acts cited and construed: Acts 1913, ch. 2, sec. 1. Acts 1899, ch. 161, sec 1.

Case cited and approved: Hermitage Club v. Shelton, 104 Tenn., 101.

Cases cited and distinguished: Tennessee Club of Memphis v. Dwyer, 79 Tenn., 452; Moriarty v. State, 122 Tenn., 440.

2. **COURTS. Previous decisions as precedents. Decisions of same court.**

Where cases, which have long been among the published decisions of the State, define privileges of the people in respect to personal conduct, involving the difference between crime and freedom from crime in respect to what constitutes the sale of intoxicating liquors, made a nuisance, and the people

---

*The question of applicability of liquor laws to social clubs dispensing liquors to members, see notes in 26 L. R. A., 573; 31 L. R. A., 510; 12 L. R. A. (N. S.), 591, 20 L. R. A. (N. S.), 1095; 23 L. R. A. (N. S.), 1092; 38 L. R. A. (N. S.), 101; L. R. A., 1915C, 876.

State ex rel. v. Mountain City Club.

of the State have acted in view of them, they will not be disregarded or reconsidered. (*Post, pp.* 113-116.)

Cases cited and approved: People v. Adelphi, 149 N. Y., 5; State v. St. Louis Club, 125 Mo., 308; Commonwealth v. Pomphret, 137 Mass., 564; Seim v. State, 55 Md., 566; Piedmont Club v. Commonwealth, 87 Va., 541; State v. McMaster, 35 S. C., 1; Barden v. Montana Club, 10 Mont., 330; Koenig v. State, 33 Tex. Cr. R., 367; Klein v. Livingston Club, 177 Pa., 224; State v. Austin Club, 89 Tex., 20; Winters v. State, 33 Tex. Cr. R., 395; Ward v. State, 56 Tex. Cr. R., 362; Graff v. Evans, 8 Q. B. Div., 373.

3. **INTOXICATING LIQUORS. Prosecution. Issues. Whether distributing a business.**

The matter of profit or nonprofit is not an immaterial circumstance where the point to be determined is whether a business is being carried on in the distribution of intoxicating liquors. (*Post, pp.* 113-116.)

4. **INTOXICATING LIQUORS. Sales. Distribution by clubs.**

The mere fact that an incorporated social club is a legal entity, distinct from its members, will not operate to make a distribution of intoxicating liquors to the members by the club a sale, where the corporation had no stock and not organized for profit, but the corporate form was used merely as a means of administering the common property among the members in a reasonable and equitable manner. (*Post, pp.* 113-116.)

5. **CRIMINAL LAW. Evidence. Judicial notice.**

It is a matter of common knowledge, of which the supreme court may take judicial notice, that since the legislative enactment of various statutes extending from time to time the territorial scope within which intoxicating liquors cannot be legally sold, clubs have sprung up in great numbers in different localities, and obtained charters, whose apparent purpose is to evade, if possible, under the forms of law the effect of these statutes. (*Post, pp.* 116, 117.)

FROM HAMILTON.

Appeal from the Circuit Court of Hamilton County to the Court of Civil Appeals, and by *certiorari* to the Court of Civil Appeals from the Supreme Court. —S. D. McREYNOLDS, Judge.

FRANK M. THOMPSON, Attorney-General, for the State.

M. M. ALLISON, J.. J. LYNCH, FRANK SPURLOCK, A. W. GAINES, T. H. COOKE, S. B. SMITH, JESSE M. LITTLETON, FRANCIS MARTIN, J. M. TRIMBLE, W. D. SPEARS, R. H. WILLIAMS and GEO. D. LANCASTER, for Mountain City Club.

MR. CHIEF JUSTICE NEIL delivered the opinion of the Court.

This case was begun in the circuit court of Hamilton county by a petition of the State filed on relation of M. N. Whittaker, District Attorney-General for the Sixth judicial circuit. The purpose of the petition was to have the club declared a nuisance and abated as such, in so far as it· dispensed intoxicating liquors to its members, or others. The main charge was that: ·

"The club has a buffet, or bar, and bar fixtures and a stock of intoxicating liquors, and is conducting, maintaining, carrying on, and engaging in the sale of intoxicating liquors as a beverage at its club apartments, No. 729 Chestnut street, in the city of Chattanooga, within four miles of a schoolhouse where school is kept, and is engaged in creating a public nuisance, as defined in section 1, chapter 2, of the Acts of 1913, Second Extra Session. . . . . The defendant, the Mountain City Club, has paid the internal revenue tax as a retail liquor dealer, and is possessed of an internal revenue tax stamp, as a retail liquor dealer."

An answer was filed, which appears to have been treated in the court below as stating the facts truly, and on trial there the court refused to grant the injunction asked and dismissed the petition. From this judgment an appeal was prayed to the court of civil appeals, and there the judgment of the trial court was affirmed. The case was then brought here by the writ of *certiorari*.

The facts, as disclosed in the answer, are in substance these: The club is duly incorporated under certain sections of the general incorporation law, which apply to organizations not created for profit, and which in one of its sections specially provides for social clubs. It was organized about eighteen years before the present proceeding was begun, and has been in continuous operation since. It has a membership limited to two hundred and twenty. The in-

itiation fee is one hundred dollars for each member, and the monthly dues are three dollars. As a result of the voluntary contributions of its members the club owns a lot ninety feet front by two hundred feet deep, at No. 729 Chestnut street, in the city of Chattanooga. On this lot it has erected a building composed of brick, and this building has a basement and two stories. The basement is used for storage purposes, and as a kitchen. In the basement are also the furnace and fuel supplies. In the first story there are a large vestibule and reception hall, a large reading room and library, writing room, dining room, billiard and pool room, buffet, and office room for the manager or steward. The second floor is devoted to bed-rooms. that are used as such by some of the club members. On this floor is also a room for exercise, shower baths, etc. The total floor space of these two floors is fourteen thousand, four hundred and ten square feet. The total space covered by the buffet is three hundred and ten square feet. The total property of the club is worth about sixty-five thousand dollars.

From the organization of the club until now the buffet has served as a mere incident to the main purpose, the social intercourse of its members, just as the reading room, dining room, and billiard and pool room have served as incidents to the main purpose. The account of the buffet has been kept separate and distinct from the other departments of the club. To this account there are charged the actual cost of

the materials used, and the actual cost of service. This cost of service consists simply of the wages paid those who are employed only for the purpose of operating the buffet. It includes no overhead charges of any kind. As the result, from November 1, 1913, to November 1, 1914, there was a loss of $1,054. Since November 1, 1914, there has been a loss of substantially the same average amount. At no time has the buffet been operated at a profit. In the same manner the restaurant has been operated at a loss. To meet these losses, and to defray the general expenses of the organization, the club members voluntarily contribute a sum in excess of $10,000 annually, without which assessment the club could not exist at all.

In the buffet intoxicating beverages are dispensed to the members, in the following manner: For the purpose a small room, called a grillroom, is used. It has no bar, but has a sideboard, tables occupying the floor of the room. The members are served at these tables. The member signs a ticket showing the drinks served there. There is charged against the member, at the end of the month, the number of drinks served to him, at a scheduled price of 12 cents per drink. This price is not sufficient to meet the expenses of the buffet. No cash is collected when the beverages are served. If the club member fails to pay his bills within a reasonable time no suit is brought or effort made to collect them. By virtue of the rules of the club he ceases to be a member and this ends the

matter.  Under the rules of the club, which are strictly enforced, no person not a member of the club is, under any circumstances, permitted to obtain anything from the club at his own expense.  If such outsider comes to the club as a guest of one of its members, he is entitled, under the rules of the club, to the same courtesy as such a visitor would expect to receive from his host in the event the entertainment in question occurred at the latter's home.

Under the express terms of the charter, no member is permitted to realize a profit out of its operation, and at no time during the history of the organization has any member received any profit or dividend from it.  While the club is operated under the direction of a president and board of governors, these officers receive no consideration of any kind for their services.  The operation of the club is carried on under the management of a steward, and servants and employees under the steward.  None of such employees are members of the club.  It is true that the clubhouse is located within four miles of a schoolhouse, and that the defendant has paid the federal tax prescribed for retail liquor dealers since its beginning, but this was paid because under the federal statutes such payment is required for clubs dispensing liquors to members only and without profit.

As previously stated the club was organized eighteen years ago.  It was organized at that time as the successor to the old club that came into existence in 1890.  It may be said, therefore, that it has been in

existence for twenty-five years. It certainly was not organized for the purpose of running a saloon. At the time of its organization there were saloons in nearly every business block in the city of Chattanooga. There was no need therefore for those who organized the club to go to the expense of establishing an institution of the kind previously described for the mere purpose of having a place to drink liquors. The club is composed of matured and sober men who have too high a regard for the realities of life to permit liquor drinking to be made an essential feature of their daily affairs. Indeed, many of the members are total abstainers, and many more rarely make use of the buffet at all, and, as previously stated, the club has a limited membership, and this membership has not been increased since the passage of the four-mile law of 1909.

The foregoing are the facts set out in the answer, upon which the trial court, and the court of civil appeals, based their decision.

So much of the act on which the petition was filed as it is necessary to quote, being section 1, is as follows:

"That the conducting, maintaining, carrying on, or engaging in the sale of intoxicating liquors; the keeping, maintaining, or conducting bawdy or assignation houses; and the conducting, operating, keeping, running or maintaining gambling houses in violation of the laws of this State, in any building, structure, or place within this State, and all means, appliances,

fixtures, appurtenances, materials, and supplies used for the purpose of conducting, maintaining, or carrying on such unlawful business, occupation, game, practice, or device, are hereby declared to be public nuisances, and may be abated under the provisions of this act.''

As already stated, the trial judge and the court of civil appeals held that, under the facts recited the defendant could not be held guilty of conducting a nuisance.

We think the conclusion is a sound one. It is clear, from the words, ''conducting, maintaining, carrying, on, or engaging in the sale of intoxicating liquors,'' as well as from the two other matters immediately following in the section, and likewise the words, ''all means, appliances, fixtures, appurtenances, materials and supplies used for the purpose of conducting, maintaining, or carrying on such unlawful business,'' etc., that a business enterprise was in the mind of the legislature; that is, the sale of intoxicating liquors as a business. This was the nuisance contemplated in the section quoted. This being true, the present controversy is seen easily to fall within the cases of *Tennessee Club of Memphis* v. *Dwyer*, 79 Tenn., (11 Lea), 452, 47 Am. Rep., 298, and *Moriarty* v. *State*, 122 Tenn., 440, 124 S. W., 1016, 25 L. R. A. (N. S.), 1252. In the first mentioned of these cases, under facts closely analogous to the facts found in the present case, and particularly that the distribution of the liquors among the members of the club

was without any profit it was held that the club was not a retail liquor dealer. Continuing, the court said:

"It is clear from the allegations of the bill that the liquors kept by the complainant was not kept for sale to the public or as a traffic, nor was the public admitted to its rooms. No person but members were admitted except strangers who live outside Shelby county, and they only upon special invitation of the members, and they are not permitted to purchase any liquors or refreshments. The liquors are purchased out of the common fund and are kept for the exclusive use of the members of the club. They are not sold for or at a profit, but the price the members are required to pay for them is regulated by the governing committee, is less than the original cost and goes back into the common fund. They are served by a servant of the complainant, who is employed at a salary and has no interest whatever in the liquors or their proceeds, and we think it is clear from the statements of the bill, that the mode of sale, as it is termed, to the members at a rate fixed by the governing committee of the club, is only in fact an equitable and convenient mode of distributing refreshments to its members, which are provided by the club for them exclusively. It cannot be controverted but that the complainant would have a right to purchase and keep liquors at its clubrooms for the use of its members, and to distribute it among them in any method it might deem proper, and to raise funds for the purpose of replenishing by assessments

upon the members, and the mode adopted of the form of a sale alone to its members of such a quantity for so much money, can be nothing more than a mode adopted of assessing each member in proportion to the amount he consumes, and cannot be distinguished in principle from that adopted in one of the cases referred to, of issuing checks to each member, which entitles him to so much liquor each, according to the amount of money he contributes.''

In the case of *Moriarty* v. *State,* also closely analogous in its facts to the case now before us, a similar result was reached. In the course of the opinion the court pointedly said:

''Not only is this record without suggestion that there was a profit made in the disposing of the liquors in this Elks' Lodge, which was carried into a 'general fund' to be used as might be in defraying the expenses of the club; but the fact is that no profit was made, the price charged for the liquor served being the simple equivalent of its price and the cost of serving the same to the members.''

Again the court said:

''We are satisfied from the uncontroverted facts in the record that the Knoxville Lodge of Elks, like the present lodge, is a *bona fide* association, organized for social, fraternal, and benevolent purposes, and that the furnishing or refreshments, inclusive of intoxicants, to its members, is purely incidental, and that the lodge was not engaged in the 'handling of liquor for sale,' within the sense of the revenue act

of 1907. From this it follows, of necessity, that the plaintiff in error, who was simply its employee and doing its service, was not guilty of the misdemeanor of either 'selling or aiding in the sale' of 'intoxicating liquors,' created by section 1 of chapter 161 of the Acts of 1899.''

In neither of the foregoing cases, however, did it appear that the United States internal revenue tax had been paid. This circumstance did appear in *Hermitage Club* v. *Shelton,* 104 Tenn., 101, 56 S. W., 838, and was held to impose upon the club the burden of showing that it was not engaged in the retail liquor business. The determining point in the conclusion that it was so engaged was found in the fact that the liquors were sold at a profit, and the proceeds turned into the general fund of the club, and likewise in 'the fact that liquor was dispensed to guests, persons not members, in such quantities as they might desire.

It is insisted that the fact of selling at a profit is really immaterial, and we are asked to reconsider these cases. These cases have long been among our published decisions, and the people of the State have acted in view of them, and it would not be right to disregard them, defining, as they do, the privileges of the people in respect to personal conduct, involving the difference between crime and freedom from crime in respect of the particular question involved. Moreover, the matter of profit or nonprofit is not an immaterial circumstance when the point to be de-

termined is whether a business is being carried on. It would be a rash conclusion to decide that a man was carrying on a business when he was consciously, intentionally, and systematically distributing his liquors or other property not only without profit, but really at a loss. The more reasonable conclusion to be drawn from such fact in connection with the nature of the institution under examination would be, as stated in the Dwyer Case, that this was simply a method of distribution of the common property among the members of the club, in an equitable manner. A technical argument is made to the effect that the corporation is a legal entity, distinct from its members, and that when a certain portion of the liquor, say a drink, is passed by the servitor of the club to one of the members on his call therefor, for his personal consumption, the title passes, and this makes a sale. The same argument might be made against the conclusion reached in the *Dwyer Case*, supra, but as in that case, so in this, we are of the opinion that the technical argument should not prevail, but that all the facts should be looked to, to ascertain the relation of the corporation to its members. The corporation is one organized not for profit, but for social intercourse between its members, and the property is the common property of all, without any stock, and without any possibility of dividends, and the corporate form was used merely as a means of administering the common property among the members in a reasonable and equitable

State ex rel. v. Mountain City Club.

manner. *People* v. *Adelphi*, 149 N. Y., 5, 43 N. E., 410, 31 L. R. A., 510, 52 Am. St. Rep., 700; *State* v. *St. Louis Club*, 125 Mo., 308, 28 S. W., 604, 26 L. R. A., 573; *Commonwealth* v. *Pomphret*, 137 Mass., 564, 50 Am. Rep., 340; *Seim* v. *State*, 55 Md., 566, 39 Am. Rep., 419; *Peidmont Club* v. *Commonwealth*, 87 Va., 541, 12 S. E., 963; *State* v. *McMaster*, 35 S. C., 1, 14 S. E., 290, 28 Am. St. Rep., 826; *Barden* v. *Montana Club*, 10 Mont., 330, 25 Pac., 1042, 11 L. R. A., 593, 24 Am. St. Rep., 27; *Koenig* v. *State*, 33 Tex. Cr. R., 367, 26 S. W., 835, 47 Am. St. Rep., 35; *Klein* v. *Livingston Club*, 177 Pa., 224, 35 Atl., 606, 34 L. R. A., 94, 55 Am. St. Rep., 717; *State* v. *Austin Club*, 89 Tex., 20, 33 S. W., 113, 30 L. R. A., 500; *Winters* v. *State*, 33 Tex., Cr. R., 395, 26 S. W., 839; *Ward* v. State, 55 Tex. Cr. R., 362, 116 S. W., 1154; *Graff* v. *Evans*, 8 Q. B. Div., 373.

It is also insisted that the cases from our own Reports which we have referred to cannot be properly cited as authority for the one now before us, because in the Dwyer Case the question was whether the club was a retail liquor dealer; and in the Moriarty Case the court had under examination an indictment charging a servant of the club with unlawfully selling intoxicating liquors without license. The question now before us is whether the defendant was engaged in conducting a nuisance. It is true the differences just suggested do exist, but still all the cases rest on the same fundamental principle. In the Dwyer Case the distinct question was whether the club was carry-

ing on a retail liquor business, and, in the Moriarty Case, while the servant was indicted for making a sale, yet it became necessary to, and the court did consider the authority of the club under which he was acting, and necessarily resorted to the same principles as those contained in the Dwyer Case. The same question was considered in the Hermitage Club Case, and that case was taken out of the authority of the Dwyer Case, simply because it appeared the Hermitage Club had been selling for profit, and to guests or strangers, and turning the proceeds into the general fund of the club. So, in the case before us, under the facts, the question really is whether the defendant was engaged in carrying on the business of a retail liquor dealer. If it was, it was guilty of committing a nuisance. If it was not so engaged, but was obeying the principles laid down in the cases of *Tennessee Club* v. *Dwyer* and *Moriarty* v. *State,* it was not guilty of committing a nuisance. It was obeying these principles, and is not guilty.

It results that the judgment of the Court of Civil Appeals must be affirmed.

We think, however, that we should add the caution which appears at the close of *Moriarty* v. *State*:

"That it is a matter of common knowledge, of which we may take judicial notice, that since the legislative enactment of the various statutes, extending from time to time the territorial scope within which intoxicating liquors can not be legally sold, clubs have sprung up in great numbers in different

localities, and obtained charters, whose apparent purpose is to evade, if possible, under the forms of law, the effect of these statutes. It is hardly necessary to say that such a club can find no warrant for its existence in the present holding. Whenever, in any case, the legality of its action in this regard is challenged by the State, it will be the duty of the court to scrutinize closely, in order to see that no such device is attended with success. In every case, when the serving of liquor to members, or others, is the principal purpose, or one of the chief objects, of such an organization, and not a mere incident, or when it is sold for a profit, this being carried into a general fund for meeting the expenses, or into a special fund for the payment of salaries, or for distribution among its members, or otherwise, the disguise should and will be uncovered, and the club and its members made amenable to the law.''

We reproduced the foregoing in an opinion recently delivered at Nashville, and do so again, at the close of the present opinion, to give added emphasis. On the facts of the Nashville case we found the club there under consideration a mere pretense, an organization gotten together under the forms of a literary and social club, but in truth only for drinking purposes.