ADA A. KEENEY and Husband, Appellants, v. LOUISA T. McVOY.

**In Banc, July 13, 1907.**

1. **APPELLATE PRACTICE: Errors Against Respondent.** Where defendant, the widow, in a partition brought by her deceased husband's only descendant, did not appeal from the interlocutory decree adjudging one-half the lands to belong to defendant, she cannot on appeal complain that the trial court erred in excluding evidence offered by her to prove averments of her answer relating to outlays for the betterment and protection of the real estate and for the care, support and education of plaintiff during her infancy and asking that the aggregate of the outlays be made a lien on the land.

2. **QUARANTINE: Election.** The widow's right to an election to take a child's part in her deceased husband's lands is not barred by a mere passive enjoyment of quarantine. But when she does exercise her right of election, that act bars the door to further quarantine.

3. **————: ————: Status Fixed.** But the mere passive enjoyment of quarantine, for whatever length of time, does not fix the widow's status as a common law dowress, or defeat her right to elect to take a child's part.

4. **————: ————: Doubts.** Courts solve doubts as to the widow's dower rights in favor of the widow.

5. **————: ————: ————: Election Dower.** The grace and favor indulged in aid of common law dower will be indulged in aid of election dower. No illiberal or sour construction will be invoked to defeat either.

6. **Dower: Election: Cut off By Partition.** An heir cannot cut off the widow's right to elect to take a child's part in her husband's land, by filing a suit to assign dower and for partition. The widow may exercise her statutory right of election after such suit is brought as well as before.

7. ———: ———: **Estoppel.** Courts will not imply from the widow's acts and conduct an election to take common law dower.

8. ———: ———: ———: **Conduct: Marriage of Heir: Relation.** Nor can such implication be drawn, either against the widow or in favor of the plaintiff (her granddaughter), from the fact that the plaintiff during her infancy lived with the widow, was supported and educated by her and was the recipient of innumerable loving kindnesses from her, while the widow peaceably and passively continued to enjoy her quarantine, and made no effort to elect a child's part until after plaintiff had married. It cannot be said that plaintiff was induced to change her situation in life (that is, to marry) in reliance on the fact that the widow, under such circumstances, was bound to take only common law dower. Such things have in them none of the elements of estoppel or of waiver.

9. ———: ———: ———: **Must Be Pleaded.** Unless estoppel and waiver are pleaded, they have no place in the case.

10. ———: ———: ———: **Pleading Quarantine.** And where the widow in her answer pleaded her quarantine as a foundation on which to build her right to reimbursement for outlays for the betterment and protection of the estate and for the education, support and maintenance of plaintiff, and the trial court held that she could not fasten a lien upon the estate for those outlays, and from that part of the judgment no appeal was taken, there is no such plea of quarantine as an estoppel or waiver as to authorize the court to hold that she by her conduct, as shown by her answer, is estoped to elect to take a child's part.

11. ———: ———: **Laches.** Laches will not be applied with close rigor to dealings between a grandmother and granddaughter, who are members of the same family. The widow's right to elect to take a child's part in her husband's estate will not be denied on the theory that she slept on her rights and permitted many years (twenty-two) to go by without making such election. That plea will not be available when the election, when made, was within the time allowed by statute.

12. ———: ———: **Time.** An election by the widow of a child's part in lieu of common law dower, within twelve months in some instances, and within fifteen months in others, after the grant of letters of administration on her deceased husband's

estate, and the filing within fifteen months of her declaration of election in the office of recorder, is timely and valid, and is not stale or invalid because letters were not granted for twenty-two years after the death of the husband. Those statutes (secs. 2943 and 2945, R. S. 1899) are, in a sense, statutes of limitation; but the limitation against her right to elect does not begin to run until letters are granted.

13. ————: ————: ————: No Administration. The widow is not chargeable with the responsibility of no administration. The fact that she did not cause letters of administration on her deceased husband's estate to be granted will not set a period to her quarantine, nor to her right to elect to take a child's part.

14. STATUTES: Construction. The reason and sense of the statute rather than its letter should control its construction.

15. ————: ————: Enlightened By Others. In ascertaining the meaning of given words found in a statute it should be construed in the light of other statutes of which it is a component part. And in determining the right of a widow to election dower, the scope and purpose of the whole Dower Act should be considered. And a like meaning given to words therein, found in the kindred Statute of Descents and Distributions, will also be considered.

16. ELECTION DOWER: No Child But a Grandchild: Right of Widow to Elect. The husband died leaving a widow, but no child, but one grandchild, who was also the grandchild of the widow. The statute reads: "When the husband shall die, leaving a child or children or other descendants, the widow, if she has a child or children by such husband living, may, in lieu of dower of one-third, . . . elect to be endowed absolutely in a share of such lands equal to the share of a child of such deceased husband." Held, that the words "if she has a child or children by such husband living" must be construed to mean "if she has descendants by such husband living" and that the widow is entitled to elect to take a child's part in the estate, that is, one-half, after debts are paid.

17. MEANING OF WORDS: Child. The word "children" may be construed to include grandchildren or the descendants of children when the context calls for it, or when the reason of the statute demands it, or when any other result would be harsh and unreasonable.

Appeal from Pettis Circuit Court.—*Hon. George F. Longan,* Judge.

Affirmed.

*Barnett & Barnett* for appellants.

(1) It is a condition precedent in the section providing for a child's part that the widow must have a child or children living by such husband at the time of his death before she can take a child's part in lieu of dower. R. S. 1899, sec. 2944. The right of a widow to elect to take a child's part in lieu of dower is a statutory privilege conferring new and important benefits and outside of statute has no existence. It must, therefore, be exercised in substantial compliance with the statute. Price v. Woodford, 43 Mo. 247. (2) The court erred in finding that defendant was entitled to a child's part because the right of quarantine is an incident to dower and the claiming of the quarantine right is inconsistent with the right to elect to take a child's part; she cannot take both quarantine and a child's part. Having enjoyed her quarantine right for twenty-two years, and having asserted and claimed said right, in this case, she can not in addition thereto elect to take and hold a child's part; the two are inconsistent. Wigley v. Beauchamp, 51 Mo. 546. (3) The election of the defendant in this case comes too late, she cannot be permitted to wait more than twenty-two years and until the situation of the parties has changed by marriage and until suit has been brought, and then make her election. Price v. Woodford, 43 Mo. 253. (a) The rights of the parties are determined as of the time of bringing the suit. The defendant's rights are fixed at that time. She cannot assert her quarantine right and enjoy it during all these years and then after suit is brought and costs are made, mend her hold and then assert an entirely different and even inconsistent right. Railroad v. McCarty, 96 U. S. 267; Grand Lodge v. Brand (Neb.), 46 N. W. 95; Douville v. Ins. Co. (Mich.), 71 N. W. 517; Insurance Co. v.

Waugh, 83 N. W. 81; Ballow v. Sherwood, 49 N. W. 796. (b) It may be contended that she could not make her election until letters of administration were taken out. But in this connection it must not be forgotten that defendant had the right to take out letters of administration herself as the widow of deceased, and her right was prior and superior to all others. Having elected to not administer, it is to be presumed that she intended to waive all rights dependent upon administration. Her conduct constitutes a declaration that there is no occasion for administration and no reason for one. (c) While there is an absolute limitation of fifteen months after the taking out of letters in which she can make her election, yet in the absence of letters being taken out, she having the right, and the first right, to take the necessary steps in order to assert her right of election, that is, the right to take out letters of administration in preference to all others, she must assert this right and make her election within a reasonable time. It will not do to permit her to enjoy her dower and quarantine rights for a lifetime and then, when she is upon the verge of the tomb, to permit her to elect to take a child's part absolutely, which she can will to others and thus defeat the heir or heirs, while she herself has never enjoyed the privileges that come from taking a child's part, namely, to sell it and enjoy the profits. She makes the election too late to serve the purpose which was intended by the Legislature.

*W. D. Steele* and *Sangree & Bohling* for respondent.

(1) (a) The defendant, under her election, was entitled to a child's part in the real estate in lieu of dower. Her husband left a descendant, to-wit, his granddaughter, who is also the granddaughter of the defendant. R. S. 1899, sec. 2941. Under this section of the statute when the husband dies leaving a child,

his widow may elect to take a child's part in lieu of dower. If the husband dies leaving children she may elect to take a child's part in lieu of dower, or if the husband dies leaving descendants, she may elect to take a child's part in lieu of dower. If this is not the law, then if a husband dies leaving grandchildren by his widow, but no children living, his widow has no choice in the matter whatever, and is confined to her dower solely. Still the law has made provision for her when the husband dies without a child or descendant. R. S. 1899, secs. 2939 and 2941. Or if the husband dies leaving a child or descendant but not by his last marriage. R. S. 1899, sec. 2940. (b) If the defendant in this case is not entitled to elect to take a child's part in lieu of dower, then the court will have to disregard the following words in the first clause of section 2944, "or other descendants." "It is a rule of construction that the statute should be construed so as to give effect to all its words, if it can be done." Bank v. Ripley, 161 Mo. 131. Why should this right be taken away from her since the relationship to her granddaughter is one degree further removed from her? In other words, why should grandchildren enjoy privileges in property rights over their grandmother, greater than their mother's would have enjoyed if living? (2) The election of the widow in this case was timely. In fact, it was made on the very first day that she had an opportunity to elect, the very day that letters of administration were issued on her deceased husband's estate. Brawford v. Wolf, 103 Mo. 394; R. S. 1899, sec. 2697; Gentry v. Gentry, 122 Mo. 220.

LAMM, J.—From a judgment in partition, adjudging to defendant an undivided half interest in a certain two hundred acres of land in Pettis county and confirming her right (which she had exercised) as widow of one Brice McVoy to elect to take said one-half

interest absolutely as a child's part in lieu of dower in the whole tract, plaintiffs appeal.

Plaintiffs, husband and wife, on April 16, 1901, sue for partition in the right of the wife, Ada A., alleging she was born Hoss, the sole child of Sallie A. Hoss, deceased; that Sallie A. was born McVoy, the daughter of one Brice McVoy; that he was the husband of defendant, Louisa T., and died intestate, seized of said real estate, in January, 1879, leaving defendant as his widow and the plaintiff, Ada A., as his granddaughter and sole heir; that his estate had been fully administered and there are no debts against it; and that Ada A. owns said real estate in fee simple, subject to defendant's dower. Wherefore, partition was asked admeasuring defendant's dower, to have and enjoy during her life; and to that end the appointment of commissioners was prayed, etc.

The answer, summarized, is as follows: It admits that Brice McVoy died, intestate, seized of the described land as alleged; admits he left defendant as his widow, and plaintiff, Ada A., as his granddaughter and sole heir; avers that said mother of Ada A. was also the daughter of defendant and is dead, and that Ada A. is a descendant of Brice McVoy and defendant; denies his estate had been administered; admits there are no debts against it, except the expenses of an administration now pending in the probate court of Pettis county; avers letters of administration were taken out on his estate in August, 1901, and that thereafter the defendant, in lieu of dower of one-third part of said land to hold and enjoy during her natural life, in due time elected to be endowed absolutely in a share of the land equal to that of Ada A. as the descendant of Brice McVoy; that said election was made in writing, duly acknowledged and filed, etc., and that by said election she became the absolute owner of a one-half interest in the land.

The answer pleads other affirmative matter, to-wit, that the land was the homestead of Brice McVoy and defendant; that they occupied it and the mansion house, etc., thereto belonging; that after the death of Brice McVoy, defendant continued to occupy the mansion house and plantation; that her dower had never been admeasured; that on the death of her husband she was entitled to her quarantine rights, i. e., entitled to remain in and enjoy the mansion house, plantation and messuages and the issues and profits thereof without the payment of rents, taxes, insurance or improvements; that to preserve said estate for herself and Ada A. she had paid certain taxes, expended certain amounts in keeping up fences and buildings, had put betterments of a given value on the land by clearing off forty acres, had expended certain sums in insuring the buildings and had rendered services of a certain value in looking after, caring for and preserving the premises; that Ada A. was of tender years on the death of Brice McVoy, to-wit, of the age of one year; and that defendant cared for, clothed and educated her at great expense, naming it. Wherefore, she prayed not only that she be adjudged to have the right to elect and by her election had become the owner of one-half of the land, but that she be allowed all of said outlays and expenses in the preservation and betterment of the estate, etc., aggregating $6,225, and that the same be declared a lien, etc.

The reply was a denial of every allegation of new matter in the answer and a renewal prayer for judgment.

At the trial, under the admissions in the pleadings, defendant took the laboring oar. She put in evidence the written application of one Quisenberry to become administrator of Brice McVoy's estate, filed in the probate court of Pettis county on the 7th day of August, 1901; the letters of administration granted him

on that day; his bond as such administrator, together with the probate order approving it; the inventory filed, showing no personal estate, but showing the real estate described in the petition — all in due form and properly verified and witnessed; the written application of defendant filed in said court and in the office of the recorder of deeds, electing to take a child's part in the described land, in lieu of dower of one-third, etc., during her natural life, said application being filed in the probate court and also recorded on August 7 and October 2, 1901, respectively. Defendant next put in evidence an annual and a final settlement, showing that the administrator collected enough rent from the real estate to pay the expenses of administration; that no claims were allowed; that he had made his proper publication of notices of appointment and final settlement, and had been discharged. All this evidence was put in over the objections of plaintiffs, which objections were overruled and exceptions saved. By these objections, plaintiffs challenged the sufficiency of said proofs to entitle defendant to elect; and as the same questions go to the validity of the judgment rendered and constitute plaintiffs' assignment of error, they will be developed later.

Defendant supplemented her record evidence by taking the stand and testifying that she was seventy-nine years old on October 13, 1903 (the trial occurred October 28 and 29, 1903); that she bore five children to her husband; that they all died before her husband; that he died on January 26, 1879; that the mother of the plaintiff, Ada A., to-wit, Sallie A. Hoss, was the last one to die; that none of defendant's children except Sallie A. left any children, and none of them were ever married except her; that Sallie A. married Albert Hoss and died on the twenty-ninth day of May, 1878; that defendant took charge of Ada A. when about one hour old and took care of her until she married, some

three or four years gone; that the land in question was occupied as a homestead by defendant and her husband and that defendant had been in possession ever since her husband's death. Defendant then tendered proof in support of the allegations of her answer touching expenditures in taxes, improvements, insurance and in the support, care and education of the plaintiff Ada A. But all this character of evidence was rejected.

Thereupon the court made its finding to the effect that Brice McVoy died seized of the described land, and left as his heirs his granddaughter Ada A. Hoss, at the time an infant, and the defendant, his widow; that Ada A. married her co-plaintiff; that she claims to own the real estate in fee simple, subject to dower; that defendant claims she elected to take absolutely a child's part of one-half; that defendant did duly make such election under the statute, and, hence, the court finds she is entitled to take one-half interest in the land under that election. An interlocutory judgment defining and establishing the interest of plaintiff, Ada A., and defendant, accordingly, was entered and partition obedient thereto was adjudged and commissioners appointed. Plaintiffs excepted to the order and judgment of the court, took conventional steps to perfect their appeal, and, under the statutes allowing an appeal from an interlocutory judgment in partition (R. S. 1899, sec. 806), they bring the case here for review.

It will be observed that the petition alleges and the answer denies that the estate of Brice McVoy was fully administered. Plaintiffs offered no proof. Defendant offered the record of an administration taken out subsequent to the suit at bar; and the case is left in that fix.

It will be observed that the petition and answer allege "there *are* no debts against the estate." In both allegations the verb is used in the present tense; and neither allegation, by fair intendment, relates to the ex-

istence or non-existence of debts at the death of Brice
McVoy in 1879. So, too, the proof leaves that matter
dark. The proof does show that at the time of taking
out letters in 1901 there were no debts, and does show
that none were allowed against the estate. No presump-
tion of fact (even if such presumption existed) need be
indulged this way or that on the existence or non-exis-
tence of debts when Mr. McVoy died. Certainly there
were funeral expenses; probably there were medical
attendance and expenses of the last sickness. In the
usual course of the usual business dealing, among aver-
age farmers, it is not likely that Mr. McVoy paid all his
debts when he rendered his final account and paid his
debt to nature. Such an ideally clear balance sheet as
that, when one is called to give up the ghost and be
gathered to his fathers, is not impossible, but can hard-
ly be said to be probable by a court that is presumed
to know that the current run of business dealing re-
sults in earthly debits and credits. For what saith the
proverb? Sins and debts are always more than we
think them to be. But, theorizing aside, all to be in-
ferred from this record is that whatever debts the es-
tate owed were settled by the widow.

It will be observed that defendant did not appeal.
This being so, the complaints made by her counsel that
the court erred, *nisi*, in excluding evidence offered by
them to prove the averments of their answer relating
to outlays for the betterment and protection of the
real estate and for the care, support and education of
Ada A., and in its failure to declare the aggregate of
these outlays a lien on the land, are not in the case at
all. In fact, learned counsel practically concede so
much as that.

But two questions are made here by plaintiffs,
*viz*:

(a) That defendant has waived, or is estopped
to claim, the right to make an election. Plaintiffs'

counsel argue that the bringing of the partition suit foreclosed her right to elect, or that the rights of the litigants are fixed by the status then existing; that her claim and enjoyment of quarantine, as disclosed in her answer, were inconsistent with her right to elect; and that the time elapsing between the death of her husband and her election, twenty-two years, bars her election.

(b)    Plaintiffs say that the statutory condition giving her a right to elect, to-wit, that she must have "a child or children" by "such husband living" (R. S. 1899, sec. 2944) is not present, *ergo*, she had no right to elect, but must take her "widow's thirds" for life as provided in our statutes declarative of the common law.

I.    As we see it, plaintiffs' learned counsel, *arguendo*, levy tribute on the doctrine of the binding force of an election of remedies, estoppel, waiver and laches and say, in effect, that defendant's right to elect to take a child's part was lost on one or all of said grounds.    They argue that the status of the widow's legal rights was fixed at the time they brought this suit; or, at least, that the filing of the suit itself was the one thing needful in fixing irrevocably her rights.    They say that by her conduct (as shown by her answer) in asserting and enjoying quarantine, she created a status of things fettering her to common law dower; that they accepted that theory by going into court to have her dower segregated and admeasured; and that she may not now mend her hold.

But we do not agree with those propositions.    Because:

(1)    It is true that quarantine is an incident of common law dower and that it is lost by an election to take a child's part.    [Wigley v. Beauchamp, 51 Mo. 544.]    In that case it was held that the widow's election to take a child's part barred quarantine.    It is

true the answer pleads defendant's quarantine right. But in pleading her quarantine right, the answer went no further than the statute goes. By Revised Statutes 1899, sec. 251, operative when an estate is under administration, it is directed that: "Until the widow's dower be assigned, the court shall order such sum to be paid to her out of the rents of real estate as shall be in proportion to her interest in the real estate." By section 2954, under the head of dower, it is provided that: "Until dower be assigned, the widow may remain in and enjoy the mansion house of her husband, and the messuages or plantation thereto belonging, without being liable to pay any rent for the same."

Construing the aforesaid statutes, the Wigley case does not hold that the right to an election is barred by a mere passive enjoyment of quarantine. It holds only that when the time comes that the widow exercises her right of election to take a child's part and does take such part, that act, *eo instanti,* shuts and bars the door to quarantine. We find no fault with this; but we do not take as sound the proposition that, when the statute gives a widow common law dower, and (as an incident thereto) an enlarged and valuable right of quarantine, and the further valuable right of an election to take a child's part, the mere passive enjoyment of her quarantine right by living under the roof and by the fireside of her husband's mansion-house, and partaking of the fruits of her husband's plantation (all of which the law says she may do and have until her dower be assigned, or she elects to take a child's part), fixes her status as a common law dowress, and defeats her right to elect to take a child's part. Such holding would breed confusion and perplexity. Whenever our Legislature intends such signal and drastic result shall follow her passive acceptance of the law's bounty for a month, a year, a lustrum, a decade, or even two (as here), it must say so with an aye that is *aye* and a nay

that is *nay*, so that its intendment is not in doubt; for as long as courts are left to inference in solving doubts, they will be solved in favor of a widow's full dower rights. For what says the maxim? In cases of doubt, the more generous and more benign presumptions are to be preferred. (*Nobiliores et benigniores praesumptiones in dubiis sunt praeferendae.*) [Chrisman v. Linderman, *infra.*]

Commencing with common law dower as a basis, the statute gives the widow certain optional rights to better her condition. All these provisions should be liberally construed to further the kindly purposes of the written law; and for us to construe our present statutes as meaning that at some time, somehow, and at some place (time, how and place unknown and put to the hazard of a guess) a widow, who says nothing to mislead others, who makes no contract shortening her legal rights and whose conduct is no more than to abide on and enjoy her husband's plantation, renounces or waives thereby other provisions of law in her behalf would be to fly in the face of a tender regard for widows — a regard running like a thread of gold through common and statutory law and evidenced again and again by the decisions of this court. [Chrisman v. Linderman, 202 Mo. 605, and cases cited.]

It has been aptly said that the part taken by the widow under her right of election is her "election dower," *i. e.*, her dower from choice as distinguished from her dower without choice. [Newton v. Newton, 162 Mo. 187; Adams v. Adams, 183 Mo. 407; McFadin v. Board, 188 Mo. 688; Chrisman v. Linderman, supra.] And, as said, we see no reason why the grace and favor of extremely liberal construction, indulged in aid of common law dower, may not be indulged in aid of election dower; nor why an illiberal and sour construction should be invoked to defeat the latter any more than the former. The law favoreth life, liberty and dower. [14

Bac. 345.] And election dower may well repose in the bosom of this friendly maxim.

(2) Nor, is it believed, can any good reason be given why an heir or devisee should have the power, through his self-serving act of filing a suit to assign dower and for partition, to thereby cut off the statutory right of the widow to elect to take a child's part. Observe, that right does not come to the widow through the door of the let, leave, act, option or license of the heir or devisee, and may seek its exit through no such door. It was created by statute and we must look to the statute alone for its finish. A stream may rise as high as its source, so that if this widow lost her right of election to take child's part, that loss must be predicated of something else than the mere filing of a suit by an heir to admeasure her dower and partition her husband's estate.

(3) It is argued that the conduct of defendant, as shown by her answer, constituted an irrevocable election to take common law dower. Let us see about that. Such a thing as *express* election to take common law dower is wholly without the statutory scheme; the widow has that right without an election. [Watson v. Watson, 28 Mo. 300.] It was held in that case that an express written election to take common law dower did not overturn the widow's right subsequently to make her timely election under another section of the dower act. It follows that if the widow is not bound by her written election to take common law dower, courts will not strain a point to imply an election in acts and conduct; for why should a widow be held to an election to take common law dower through a roundabout course when she is not held to such election on a straight line? Nevertheless, as hinted in the Watson case, a widow, being *sui juris*, may be held to be estopped by acts *in pais* upon the strength of which others change their situation. It has been held that a widow may be estopped

to claim even her common law dower by pronounced
and unequivocal acts putting her in a situation where,
when she did not speak when in conscience required to
speak, she was not allowed to speak when in conscience
she should keep quiet.   [Hart v. Giles, 67 Mo. 175.]
But we see no waiver or estoppel in defendant's con-
duct, the elements of estoppel being absent.   Attending
to the rule in the books, it was said by NAPTON, J., in
Taylor v. Zepp, 14 Mo. l. c. 488: "To constitute an
estoppel *in pais* . . . there must be, first, an admis-
sion inconsistent with the evidence proposed to be giv-
en, or the claim offered to be set up; second, an action
by the other party upon such admission; third, an in-
jury to him by allowing the admission to be disproved."

In Acton v. Dooley, 74 Mo. l. c. 67, HENRY, J., bor-
rows and adopts Bigelow's oft-quoted formulation of
the essential elements upon which estoppel proceeds,
*viz.*: "The following elements must be present in
order to an estoppel by conduct:  First.  There must
have been a misrepresentation or concealment of ma-
terial facts.  Second.  The representation must have
been made with knowledge of the fact.  Third.  The
party to whom it was made must have been ignorant of
the truth of the matter.  Fourth.  It must have been
made with the intention that the other party should act
upon it.  Fifth.  The other party must have been in-
duced to act upon it.  The term 'representation' is used
for convenience.  It is not necessary that there should
have been express statements.  The representation may
be implied from acts, silence or concealment.'  Again
he says: 'The rule is well settled, that if the represen-
tation containing all the foregoing elements has also
been acted upon, the estoppel arises.'  [Ib. 492.]  'But
unless the representation is acted upon, the estoppel
cannot arise' (Ib. 493); and 'it seems that it must be
exclusively acted upon; at all events, there can be no
estoppel where the party claiming one is obliged to in-

quire for the existence of other facts, and to rely upon them also in acting.' [Ib. 493.]''

Bigelow, in the fifth edition of his work on Estoppel, reformulated his views; and, as reformulated, his analysis of the elements of an estoppel *in pais* has been quoted with approval by this court in Gentry v. Gentry, 122 Mo. l. c. 221, thus: ''First. There must have been a false representation or a concealment of material facts. Second. The representation must have been made with knowledge, actual or virtual, of the facts. Third. The party to whom it was made must have been ignorant, actually and permissibly, of the truth of the matter. Fourth. It must have been made with the intention, actual or virtual, that the other party should act upon it. Fifth. The other party must have been induced to act upon it. [Bigelow on Estoppel (5 Ed.), p. 570. See also, Blodgett v. Perry, 97 Mo. 263, and cases cited; Stagg v. Linnenfelser, 59 Mo. 336.]''

It is argued that Ada A. and Frank changed their situation in life (we take it by marriage) in reliance on the fact that the grandmother was bound to take only common law dower; that the grandmother may not now ''mend her hold.'' This contention reflects credit on the ingenuity of learned counsel. But, at most, it is an hypothesis putting a dollar-and-cent estimate on the consideration leading up to the marriage contract. It has no foundation in the proof. There is not a spark (*scintilla*) of evidence directed to such fact. What was the grandmother's ''hold?'' Simply a bundle of rights the law gave her — rights existing at the same time jointly, and to become several and severable by election. Observe, this grandmother and granddaughter were not dealing at arm's-length. We may assume, under the proof, they lived in each other's arms in loving kindness, sharing mutually in the usufruct of the estate and, peradventure (according to the usual

course of a grandmother's ungrudging and unselfish love, flowing on in an unruffled current), the granddaughter received the lion's share of the benefit without thought of waiver, estoppel or laches on either side. Each and all of these formidable and learned things are not the product of an every day, homespun estimate of their mutual conduct and relations. To the contrary, they are the cold, technical emanations of legal learning directed to and characterizing that conduct — arising by retrospection, colored by possible estrangement, from the viewpoint of years afterwards, and made on a cold business basis — a basis that may well have been unthought of by the grandmother, the granddaughter or her father or other kin.

But by strict right neither waiver nor estoppel have place in the case, because plaintiffs pleaded neither in their petition; and they pleaded neither in their reply. It is elementary that neither can be invoked without a plea.

So, by strict right there is no question of quarantine in this case on review. Observe, quarantine was pleaded in the answer somewhat by way of inducement, or, at best, as a foundation on which to build the right to recoup, against the share of Ada A., outlays in betterments and in the protection of the estate and for her education, support and maintenance. That was the only function assigned to the widow's enjoyment of quarantine. The court adjudged defendant could not fasten and foreclose a lien upon the estate for these outlays. With that judgment (unappealed from by defendant) the whole question of quarantine, for the purposes of the case, was eliminated.

If Frank had been induced by the grandmother to take Ada as his wife on the theory that she had renounced her right of election to take a child's part, or if Ada had been induced by the grandmother to take Frank as her husband on such theory, and if plaintiffs

had pleaded such estoppel, and the proof tended to establish the fact, a different case might be here.

(4)   But it is argued that defendant's claim of a right to elect was stale, that we should note the long flight of time and give effect to laches on the grandmother's part arising from such flight — that she "slept on her rights." It is argued that, giving effect to these things, the right to elect to take a child's part has been lost. It is not believed wise to apply laches with close rigor to dealings between a granddaughter and a grandmother, members of one family; domestic felicity receives no aid from the application of such doctrine, unless imperatively called for; nor do we see how the mere lapse of time destroyed the right to elect as long as the election, when made, was within the time allowed by statute.   Under section 2943, in the chapter on Dower, the widow may elect in given instances within twelve months after the grant of letters testamentary or of administration; and she must file her declaration of election in the recorder's office within fifteen months after the grant of such letters.   By section 2945, in a given instance, she may elect by a declaration in writing, duly acknowledged and filed as pointed out, in fifteen months after the grant of letters testamentary or of administration.   Failing to elect under one section or the other, she is endowed as otherwise provided in the Dower Act.

These statutes may be said, in a sense, to be statutes of limitation on a widow's right to elect.   The limitation begins to run when letters of administration are taken out on her husband's estate, and ends twelve or fifteen months thereafter.   Other rights relating to real estate are lost by not being enforced within ten years after they accrue.   So the enforcement of written contracts is similarly barred.   Five-year statutes of limitation exist, and one, two, and three year statutes exist pertaining to other matters.   Litigants interested

in matters within the purview of such statutes may look to them for the definite beginning and end of their substantive rights. But it is contended that it is not so with a widow; that, in the matter of her election to take a child's part, she may not safely rely on the statutes creating her right, pointing out the remedy and setting the period for her action; but that the statute is dark and she is put to the hazard of a guess (at her peril if she guess awry) to determine when her year or her year and a quarter begins to run and when it ends. This notion may be put aside as a harsh and austere innovation, serving no good end. It is argued that she is to be charged with the responsibility of no administration; and that she should have instituted one and thus put a period to both her quarantine right and her right of election — as if the law doled out her widow's rights grudgingly and with a cold complexion; as if the law would construe her sleeping in her husband's mansion house, as "sleeping on her rights." But we look in vain in the written law for any support to that argument. It is true she had the first right to sue out letters of administration; but such right ended shortly and the matter was open to any creditor or heir, or was open to the order of the probate court putting the public administrator in charge. No one moved; and must she bear the whole responsibility (and punishment) for no administration from 1879 to 1901?

Let us look at the matter from another side. She could have been put to an administration and her right of election at any time by the heir moving in the assignment of dower. Ada A. having an estate, her father was entitled to be appointed her guardian and curator. Having an estate and he failing to become her guardian and curator, the probate court on suggestion from any person had power to cite him to appear and show cause; and had power to move *sua sponte* (R. S. 1899, secs. 3479 and 3480) in the appointment of a guardian

and curator. Moreover, a minor over the age of fourteen has the right to choose a guardian and, on failure, the probate court of Pettis county was charged with the duty to appoint one. [See R. S. 1899, secs. 3485, 3486, and 3487.] Nay, more; not only could a guardian and curator sue in partition, but any attorney at law under employment could have gone into the circuit court and forced the hand of the widow by suing in partition for the child. [See R. S. 1899, sec. 2967; Padgett v. Smith, *infra*, p. 303, and cases cited.] As we look at it, it passeth understanding how we can charge against this widow the whole responsibility for no administration during these years; and we shall not do so. Because, having the right to elect within a certain time after the appointment of an administrator by express statute, and having elected within the statutory time, shall the courts say to her: "Your election is stale or is lost by the flight of time." How comes it, if she had the right under the statute to await the appointment of an administrator, as she had, that the exercise of that right, with its incident of quarantine, is to be turned upon her as a weapon for her undoing?

In Masterson v. Railroad, 204 Mo. 507, it was contended that the fact that a witness (a motorman) had refused to testify at the coroner's inquest on the death of a child and based his refusal on his fear of incriminating himself, could be used against him when subsequently he was placed upon the stand in a damage suit and testified he was without fault in the death of the child. In disallowing that contention, VALLIANT, J., finely said: "The right of the motorman to refuse to testify under the circumstances stated was a personal right of such high importance that it is expressly guarded in the Constitution itself. It is there given absolutely and unequivocally, yet we are now asked to declare that it is a right which the citizen will exercise at his peril, the peril of being branded with suspicion,

the peril of having it brought up against him to impeach him if he should ever assert his innocence. . . . The courts have no right to brand as criminal or suspicious an act which the law unconditionally and unequivocally authorizes to be done.'' So here, this court will not count as negligent, in aid of staleness and laches, the flight of time which this old grandmother was no more responsible for than others, nor will it give a sinister twist to her enjoyment of quarantine. The law gave her the right to wait the initiative of others. It does not say she shall move. She rested on that right. Shall all this now be counted against her? Indeed, in the assignment of dower, the law contemplates that others should take the initiative and makes ample provision therefor (see R. S. 1899, sec. 2967, *supra*); and one reason for the existence of her large quarantine right is to press a thorn in the side of all interested to spur them on to admeasure her dower.

It is not without significance that the adjudicated cases take no note of the flight of time in meting out to widows their dower and quarantine rights, when they are in possession of the land. In Brawford v. Wolfe, 103 Mo. 391, Davis died in Kentucky in 1865, leaving a wife, Maria, and seized of land in Putnam county in this State. Two years later the widow married Russell. In 1881 letters of administration were granted by the probate court of Putnam county. There was no evidence that the deceased owed any debts in this State or elsewhere. In March, 1881, Maria Russell elected to take one-half the real estate. Her election was sustained. It is right to say, however, that questions raised here were not presented or considered in the Brawford case.

Of course the assignment of dower clips off the widow's quarantine. Now the same argument said to drive her to speedy administration in order that

she might elect to take a child's part and thus restore to the heir the residue of the estate free from quarantine, ought to drive her to move in having her dower assigned so as to restore to the heir the residue of the estate free from quarantine. Cases relating to the assignment of dower are, therefore, in point and counsel for defendant cite a line of them in which the widow's quarantine was allowed to run for many years because her dower had not been assigned. See, for example: Brown v. Moore, 74 Mo. 633; Holmes v. Kring, 93 Mo. 452; Westmeyer v. Gallenkamp, 154 Mo. l. c. 36; Graham v. Stafford, 171 Mo. 692.

But we have pursued the matter far. The election was timely and there is no substantial merit in the assignment of error now up. Accordingly, it is disallowed.

II. With the foregoing at rest, we confront the anxious question in the case, to-wit: Has a grandmother a right to elect to take a child's part as against her granddaughter, the mother of the latter being dead?

Defendant bottoms her right of election upon Revised Statutes 1899, section 2944, reading: "When the husband shall die, leaving a child or children or other descendants, the widow, if she has a child or children by such husband living, may, in lieu of dower of the one-third part of all lands whereof her husband died or shall die seized of an estate of inheritance, to hold and enjoy during her natural life, elect to be endowed absolutely in a share of such lands equal to the share of a child of such deceased husband. The provisions of this section shall be subject to the payment of her husband's debts."

Plaintiffs' learned counsel, as said, argue that the statutory condition precedent to defendant's right to elect is absent, to-wit, a child or children, born of defendant by her deceased husband, living; *ergo,* the

right of election is out of the case and defendant must rest content with common law dower. Defendant's learned counsel argue that some effect must be given to the phrase "other descendants;" that the real meaning of the section is found in the idea that if the widow had a child or children by the husband and such child or children or the descendants of such child or children be living, then such widow has a right to elect. They say, in effect, that the phrase "child or children" should be held to include descendants, grandchildren; that all the sections of the Dower Act should be construed *in pari materia*—the one section piecing out the other; that the construction demanded by plaintiffs is sourly narrow and squeezes the life out of a benign law, making it unjust.

The province of courts is to construe, not to construct, statutes—to declare, not to make, laws. To declare the law is not to make it. (*Jus dicere et non jus dare.*) A canon of construction to which all others must give place or to which, more strictly speaking, all others are mere aids, is to get at the intent of the statute and enforce that intent.

Edmund Plowden in his notes to Eyston v. Studd, 2 Plowden's Rep. 465, points to the primal thing to be observed (with discrimination, of course) in the exposition of every statute. Thus: "From this Judgment and the Cause of it, the Reader may observe, that it is not the Words of the Law, but the internal Sense of it that makes the Law, and our Law (like all others) consists of two Parts, viz.: of Body and Soul, the Letter of the Law is the Body of the Law, and the Sense and Reason of the Law is the Soul of the Law. . . . And the Law may be resembled to a Nut, which has a Shell and a Kernel within, the Letter of the Law represents the Shell, and the Sense of it the Kernel, and as you will be no better for the Nut if you make Use only of the Shell, so you will receive no Benefit by the Law,

if you rely only upon the Letter, and as the Fruit and Profit of the Nut lie in the Kernel, and not in the Shell, so the Fruit and Profit of the Law consist in the Sense more than in the Letter. And it often happens that when you know the Letter, you know not the Sense, for sometimes the Sense is more confined and contracted than the Letter, and sometimes it is more large and extensive.''

It is a maxim that law regards equity. Referring to this maxim, Lord MANSFIELD comments as follows: ''As for construing the statute by equity, *equity is synonymous with the meaning of the legislator.* . . .'' [1 Blackstone's Rep., 1. c. *95.] In his Commentaries (1 Bl. *60, 61) Blackstone goes to the root of the matter, thus:

''As to the effects and consequence, the rule is, that where words bear either none, or a very absurd signification, if literally understood, we must a little deviate from the received sense of them. Therefore the Bolognian law, mentioned by Puffendorf, which enacted 'that whoever drew blood in the streets should be punished with utmost severity,' was held after long debate not to extend to the surgeon who opened the vein of a person that fell down in the street with a fit.

''But, lastly, the most universal and effectual way of discovering the true meaning of a law, when the words are dubious, is by considering the *reason* and *spirit* of it; or the cause which moved the legislator to enact it. For when this reason ceases, the law itself ought likewise to cease with it. An instance of this is given in a case put by Cicero, or whoever was the author of the treatise inscribed to Herennius. There was a law, that those who in a storm forsook the ship should forfeit all property therein; and that the ship and lading should belong entirely to those who stayed in it. In a dangerous tempest all the mariners forsook

the ship, except only one sick passenger, who, by reason of his disease, was unable to get out and escape. By chance the ship came safe to port. The sick man kept possession, and claimed the benefit of the law. Now here all the learned agree, that the sick man is not within the reason of the law; for the reason of making it was, to give encouragement to such as should venture their lives to save the vessel; but this is a merit which he could never pretend to, who neither stayed in the ship upon that account, nor contributed anything to its preservation."

An old case is in the books, arising under a Roman law that forbade strangers to scale the walls on penalty of death. The city was assailed by enemies. Thereat certain strangers within the city flew to its rescue, scaling the walls in defense. It was unanimously held by the Roman Senate that though they came within the letter, they were without the reason of the law and should not be punished.

In Humphries v. Davis, 100 Ind. l. c. 284, ELLIOTT, J., elegantly formulated a general rule of statutory construction (of use here) as follows: "A statute is not to be construed as if it stood solitary and alone, complete and perfect in itself, and isolated from all other laws. It is not to be expected that a statute which takes its place in a general system of jurisprudence shall be so perfect as to require no support from the rules and statutes of the system of which it becomes a part, or so clear in all its terms as to furnish in itself all the light needed for its construction. It is proper to look to other statutes, to the rules of the common law, to the sources from which the statute was derived, to the general principles of equity, to the object of the statute, and to the condition of affairs existing when the statute was adopted."

Coming closer home, our statutes provide (R. S. 1899, sec. 4160): "The construction of all statutes

of this State shall be by the following additional rules, *unless* [much force in this "unless"] *such construction be plainly repugnant to the intent of the Legislature, or of the context of the same statute*: First, words and phrases shall be taken in their plain or ordinary sense, but technical words and phrases having a peculiar and appropriate meaning in law shall be understood according to their technical import. . . ."

In Kane v. Railroad, 112 Mo. l. c. 39, *et seq.*, we said: "That the letter of a statute must occasionally be cut down to conform to its evident spirit and intent is a maxim of interpretation which is not new in Missouri. It has been acted upon by this court in many instances, of which we need only cite as illustrations Hobein v. Murphy, 20 Mo. 448, and Walton v. Harris, 73 Mo. 489."

In Verdin v. St. Louis, 131 Mo. l. c. 163, we had under exposition section 27 of article 6 of the charter of St. Louis. Wresting somewhat the language of the section, it was said: "This view is sanctioned by abundant authorities which hold that the letter of a statute may be enlarged or restrained, according to the true intent of the framers of the law. [Whitney v. Whitney, 14 Mass. 92; State ex rel. v. Emerson, 39 Mo. 80; State ex rel. v. King, 44 Mo. 283; Riddick v. Walsh, 15 Mo. 519.] In such cases, the *reason* of the law prevails over its letter, and general terms are so limited in their application as not to lead to injustice, oppression, or an absurd consequence, the presumption being that the Legislature intended no such anomalous results. [United States v. Kirby, 7 Wall. 482; People ex rel. v. McRoberts, 62 Ill. 38; Fusz v. Spaunhorst, 67 Mo. 256; Sutherland, Stat. Constr., p. 288.]"

To the same effect are State *ex inf.* v. Talty, 166 Mo. l. c. 559, *et seq.;* State *ex rel.* v. Railroad, 105 Mo. App. l. c. 213; and see (*arguendo*) State *ex rel.* Smith v. Neosho, 203 Mo. l. c. 72, *et seq.*

Attending then to the intent of the Dower Act, it will be seen that from end to end it is animated by two dominating and impelling thoughts, *viz.*: First, the primary protection of common law dower, forbidding any bar without the assent of the wife. [R. S. 1899, secs. 2933 and 2946.] And, second (and by no means least), the giving of certain valuable options, whereby a widow may increase the value of her common law dower, enlarging it and making it more responsive and useful to her needs in the sharp vicissitudes of life. [R. S. 1899, secs. 2939, 2940, 2941 and 2944.]

By section 2939, supra, if a husband die without any child or other descendant in being capable of inheriting his widow was given an option. The construction put by this court on that section is instructive. It will be seen that a widow claiming under section 2939 must show that her husband died "without any child or other descendants in being capable of inheriting." A husband died having an adopted child, and the clause "child or other descendants in being" was construed to embrace an adopted child. [Moran v. Stewart, 122 Mo. 295.] In that case the court had under exposition also the Adoption Act (R. S. 1899, sec. 5246) providing that any person desiring to adopt any child or children as heir "*or devisee*," it shall be lawful to do so by *deed*, etc. At first blush the statute looks as if the Legislature intended that a deed might take the place of a will—the one fixed, the other ambulatory. In commenting thereon, BLACK, J., said: "Much carelessness and want of precision is disclosed in this and other sections of the same act, and it is quite evident that the word [devisee] was not used in its legal sense. We think it may be disregarded without changing, in the least, the force, effect and meaning of the statute." This language is not without application to section 2944 and other sections of the Dower Act.

By section 2940 the statute supplies a working plan in case a husband has been married twice and leaves children by his first marriage, but none by his last. In such case his widow has a certain right of election. Then in section 2941 the case is up of a husband dying leaving no child or other descendant living and capable of inheriting. His widow may take her common law dower or elect under section 2939. Then comes section 2944 upon which defendant relies. It will be observed that every other widow is provided for before this section is reached, except the one large and naturally to-be-expected class, to-wit, mothers who have borne children by their deceased husbands—a class of widows deserving of nothing but exquisite gentleness and seemly deference and bounty at the hands of all law—human or divine. It is treason to better human nature, it seems to me, to suppose that legislation was passed intended to deal harshly with them or any of their kind. Section 2944 undertakes to put the cap-sheaf on the statutory scheme and to allow such widows their election dower. Plaintiffs concede defendant's right to elect if her child, Sallie A. Hoss, had lived; but they say, in effect, that when death robbed her of her only child, it also snatched away her right of election, because she could no longer measure up to the statutory standard of having "a child or children living by" Brice McVoy. If that be the law, then the law adds point to the sting of death— a pinch in the pocket dogging the heels of her calamitous stroke. The phrase "children by him" may be assigned a useful purpose. It cut away the widow's right to bottom her election under that section on children born to her by a former husband, or on children she might contract to adopt.

It may stand conceded that the section is unhandsomely worded and lacking in precision, but, if possible, under permissible rules, it ought to be construed so

as to include a grandmother whose children are dead, and this in obedience to the dominating thought in the Dower Act. That "children" may be construed to include grandchildren or the descendants of children when the context calls for it, when the reason of the statute demands it, and when any other result would be harsh and unreasonable, I make no manner of doubt. The most that can be said of the word "children" is that prima facie it is presumed to mean direct offspring. Anderson says (Anderson's Law Dict., word, "child") that the primary definition is an infant, this in a popular sense; that the next allowable use in meaning is "one of tender years, a young person, a youth;" that the next allowable use of the word is as meaning "a legitimate descendant in the first degree;" and the next is "a legitimate descendant in any degree; but, in this case, 'children' is the word used; offspring, issue or descendants generally"—the author commenting thus: "While the word 'children' will include grandchildren, the presumption of law is against such construction."

In *In re* Williams' Estate, 62 Mo. App. 339, the Kansas City Court of Appeals had under exposition section 2913, Revised Statutes 1899, found in the Descents and Distributions Act. That section runs thus: "When any of the children of the intestate shall have received, in his lifetime, any real or personal estate, by way of advancement, shall choose to come into partition with the other parceners, such advancement shall be brought into hotchpot with the estate descended." The question was whether the word "children" included grandchildren. That learned court made no doubt it did, speaking through SMITH, P. J., as follows:

"The statute, section 4470 (now 2913), in express terms, requires only children of the intestate, who have received advancements, to bring the same into

hotchpot, before they can share with the intestate's other children in the distribution of his estate. It is apparent, however, upon the very face of this section, that the purpose of its enactment was to secure an equal distribution of the estate of intestates among their children. This is the dominating thought, which is expressed in language too plain to be misunderstood. To give effect to such intent, the courts have, in a great variety of cases arising under statutes of distribution, and under wills, construed the term 'children' to be broad and comprehensive enough in its signification to include 'grandchildren.' In 4 Kent's Commentaries, 418, it is stated that, when the statute uses the term 'children' it may stand in a collective sense for 'grandchildren' when justice or reason requires it. And to the like effect are these authorities: Endlich on Interpretation of Statutes, secs. 80, 321; Wyth v. Blackman, 1 Vesey, Sr. 196; Royle v. Hamilton, 4 Vesey, Jr. 437; Eshleman's Appeal, 74 Pa. St. 46; Hersha v. Brenneman, 6 Serg. & R. (Pa.) 2; In re Paton, 41 Hun 500.

"Having in view what was the manifest intent of the Legislature in the enactment of the statute, we think the term 'children' therein used should be so construed as to include the grandchildren, who are the children of a child of the intestate, who has received an advancement in his lifetime. Such a construction, we think, best effectuates the legislative intent."

In Kyle v. Kyle, 18 Ind. 108, the Supreme Court of Indiana had under construction the 26th section of the act concerning descents, providing: "That if a husband or wife die, intestate, leaving no child, and no father or mother, the whole of his property, real and personal, shall go to the survivor." It was contended in that case that the word "child" did not include a grandchild or grandchildren; and, on the theory that such construction was plainly inconsistent with

the intention of the Legislature as gathered from the context, it was held that the section properly inter-preted must be construed as if it read as follows: "If a husband or wife die, intestate, leaving no children or their descendants, and no father or mother, the whole of his or her property, real or personal, shall go to the survivor."

In Walton v. Cotton, 60 U. S. (19 How.) 355, the Supreme Court of the United States had an act under exposition which, with several supplements thereto, provided for the relief of certain surviving officers of the Revolution; and it was held that the word "children" in the acts embraces the grandchildren of a deceased pensioner, whether their parents die before or after his decease. In that case Justice McLEAN said:

"But should the word children, as used in these statutes, be more restricted than when used in a will? In the construction of wills, unless there is something to control a different meaning, the word children is often held to mean grandchildren. There is no argument which can be drawn from human sympathy, to exclude grandchildren from the bounty, whether we look to the donors or to the chief recipient.

"Congress, from high motives of policy, by granting pensions, alleviate, as far as they may, a class of men who suffered in the military service by the hardships they endured and the dangers they encountered. But to withhold any arrearage of this bounty from his grandchildren, who had the misfortune to be left orphans, and give it to his living children, on his decease, would not seem to be a fit discrimination of national gratitude.

"Under the construction given by the Department, if a male pensioner die, leaving no widow or children, but grandchildren, the pension cannot be drawn from the Treasury. This would seem to stop short of carry-

ing out the humane motive of Congress. They have not named grandchildren in the acts; *but they are included in the equity of the statutes."*

Other cases to like effect might be cited. The Dower Act but supplements the Descents and Distributions Act. They must be taken and construed together. Cases illuminating the one, throw light on the other, and based on the reasoning aforesaid, and in the light of the foregoing authorities, we have no difficulty or hesitation in construing the word "children" in section 2944, supra, to include grandchildren. Any other construction would lead to absurd and unjust results and be obviously without the legislative intent.

In this view, the judgment in partition should be affirmed. It is, accordingly, so ordered and the circuit court is directed to proceed with the partition of the land of Brice McVoy, deceased, according to its terms, giving the defendant one-half under her election and Ada A. the other half as heir at law. *Gantt, C. J., Burgess, Fox,* and *Woodson, JJ.,* concur; *Graves, J.,* concurs in the first paragraph and dissents in the second; *Valliant, J.,* dissents.