## STATE OF MISSOURI, Respondent, v. C. J. McMURTRY, Appellant.

### Springfield Court of Appeals, February 5, 1912.

1. **LOCAL OPTION LAW VIOLATIONS: Indictment: Charging Several Offenses.** In a prosecution for violating the Local Option Law an indictment is not bad because it charges the storing, keeping and delivering of intoxicating liquors in the same count.

2. ————: **Storing and Delivering Liquor: Defendant's Interest in Liquor Stored.** Defendant was prosecuted and convicted for violating the Local Option Law by unlawfully storing, keeping and delivering intoxicating liquors. The defendant claimed that he and others had gone in together to purchase cases of beer at various times and that he was a part owner of all the beer kept in his basement. It appeared in evidence that defendant kept the beer in the basement of his hotel with the understanding that the other parties who had contributed to the purchase thereof could go into the basement and drink and take away any of the bottles of beer they might select. *Held*, that even though defendant may have been a part owner of the cases of beer, of which the bottles taken or drank by the other parties were a part, yet, as soon as such party took a specific part of the whole it could then be said under all the facts in evidence in this case, that defendant had stored or kept for such parties the specific part so appropriated by them and the instructions covering this theory are approved, as being proper when applied to the evidence in this particular case. GRAY, J., concurring, holds, that defendant's guilt was established by his own testimony, on the authority of State v. Burns, 140 S. W. 871, but he does not agree that the opinion in the Burns case correctly declares the law.

State v. McMurtry.

3. ———: ———: ———: **Sufficiency of Evidence.** In a prosecution for violating the Local Option Law by keeping, storing and delivering intoxicating liquors, it appeared in evidence that a number of persons, which always included defendant, would make up a sum of money and defendant would order one or more cases of beer, which beer upon its arrival was put in the basement of defendant's hoted, in which was also a counter and a locker and defendant was careful to see that the supply of beer in the locker was never exhausted. When the sheriff went into the basement he found 102 bottles of beer in the locker, twenty-seven cases and four barrels filled with empty beer bottles, and 275 empty beer bottles scattered around. In the sample room of the hotel were four trunks with 400 bottles of beer in them. The parties who contributed to the purchase of the beer could go there at any time and take their friends and drink at will and take beer away with them, if they so desired. *Held*, that under the evidence defendant was clearly within the purview of the statute, notwithstanding his interest in the beer purchased and that the demurrer to the evidence was properly overruled.

4. ———: ———: ———. Although the defendant in this case was properly convicted for violating the Local Option Law, in keeping, storing and delivering intoxicating liquors notwithstanding it appeared in evidence that he contributed with others to the purchase of the liquors, which were stored in his basement and were kept accessible to all persons who had contributed to its purchase, yet the court does not hold that two or more persons cannot under any circumstances order liquor together for their own or family use and have it shipped in the name of one and received and kept by him until the division is made; whether or not the Local Option Law applies to such a state of facts is a question that the court declares is unnecessary to decide in this case.

5. ———: **Acting in Good Faith.** It has always been the practice in prosecutions for violating the Local Option Law to submit to the jury the question of whether the defendant acted in good faith, or whether he employed the means he used as a mere subterfuge for the purpose of defeating the law. GRAY, J., in concurring opinion.

Appeal from Dent Circuit Court.—*Hon. L. B. Woodside,* Judge.

AFFIRMED.

161 App.—26

*W. P. Elmer* and *John M. Stephens* for appellant.

(1) Different offenses may be charged in separate counts, if the acts charged are not repugnant, but not in the same count. State v. Nichols, 124 Mo. App. 330; State v. Rosenslatt, 185 Mo. 114; State v. Blakely, 184 Mo. 189; State v. Fox, 148 Mo. 514. The indictment charged "keeping, storing and delivering too" the witness Organ. The acts of keeping and storing for are inconsistent with the act of delivering to. Kelly on Criminal Law, secs. 201, 206. (2) The evidence in this case does not sustain the charge of "storing." Organ's testimony shows defendant had no more control over the beer than had Organ, and that it was in the defendant's possession only long enough for them to drink it. Only on two occasions did Organ have beer in defendant's basement and it was consumed in three hours. State v. Rawlings, 134 S. W. 530. (3) The words, "keep, store, deliver" used in said act are meant in their legal sense and in connection with the purpose and intent of the Local Option Law to prohibit the illegal sale of intoxicants. 4 Words and Phrases, 3914; 7 Words and Phrases, 6675. (4) "Keeping" and "storing" imply a duration of time and as used in said act imply an illegal purpose. The custody of intoxicating liquors for a few hours or until the owners could use it, did not warrant the court's instruction on storing. State v. Rawlings, 134 S. W. 530. (5) It is not a violation the act of the Legislature of 1907 to store intoxicating liquors in a local option county, as the agent of another, if such liquors are not intended for sale and use in such county. It must be done to further sales or in connection therewith. Session Acts 1907, 232; State v. Buehler, 148 Mo. App. 615; State v. Buehler, 128 S. W. 518. (6) The purpose of the Act of 1907 is fully explained by the Supreme Court in the Price case and it was not intended to make criminal such

acts of friendly intercourse and fellowship as is shown by the testimony. State v. Price, 229 Mo. 670, 129 S. W. 650; State v. Clow, 131 Mo. App. 548; State v. Buehler, 148 Mo. App. 615. (6) Giving away intoxicants is not a violation of the Local Option Law unless done with purpose of furthering sales of liquors. State v. Handler, 178 Mo. 38; State v. Fulks, 105 S. W. 736. (7) The instructions commented on the testimony in that they told the jury that defendant's acts constituted a storing of the beer. This was an error. It should have defined "storing." State v. Brietwiser, 88 Mo. App. 648; State v. Higgerson, 157 Mo. 395; State v. Grugin, 147 Mo. 39.

*Lawrence T. McGee,* Prosecuting Attorney, and *Eugene W. Bennett,* Assistant Prosecuting Attorney, for respondent.

(1) The indictment is valid and sufficient and concisely presents the charge under the statute. R. S. 1909, sec. 7227; State v. Rawlings, 134 S. W. 530; State v. Price, 229 Mo. 670. (2) The indictment is not bad for duplicity because it charged "keep and store for and deliver to." And certainly there can be no complaint as the court withdrew from the consideration of the jury the question of "delivery" and instructed alone on "keeping and storing." State v. Fletcher, 18 Mo. 425; State v. Myers, 20 Mo. 411; State v. Heinze, 45 Mo. App. 410; State v. Pittman, 76 Mo. 56; State v. Cannon, 134 S. W. 513; State v. Hogle, 137 S. W. 21. (3) The indictment is sufficient against the attack that the indictment should negative defendant's right to sell intoxicating liquor as a dramshop keeper or wholesaler. The indictment need not negative exceptions in other clauses or other sections of the statute which create defenses and as the exceptions complained of are contained in a different section they need not be negatived in the indict-

ment.  State v. Buford, 10 Mo. 704; State v. Meek, 70 Mo. 355; State v. O'Brien, 74 Mo. 549; State v. Brockstruck, 136 Mo. 351; State v. Price, 229 Mo. 682.  (4) Instruction 5 is proper and fair and correctly defined "storing;" it was necessary for the court to define this term to the jury and this is the only possible interpretation that would make this law effective for any purpose.  State v. Boehler, 148 Mo. App. 614; State v. Rawlings, 134 S. W. 530.  (5) Instruction No. 8 supplements instruction No. 5 in further defining "keeping and storing" and is proper and correct. State v. Rawlings, 134 S. W. 530.

COX, J.—This is a proceeding by indictment in four counts against the defendant charging him with keeping, storing and delivering intoxicating liquors in Dent county, in violation of section 7227 of the Revised Statutes of 1909.  The state dismissed as to the fourth count, and on trial before a jury, the defendant was convicted on the first count and acquitted on the second and third.  The first count charged that the Local Option Law was in force in Dent county, and that while said law was in full force and effect, and on or about the 11th day of March, 1911, the defendant "did then and there deliver to another person, to-wit, Burt Organ, in a certain building there situate, certain intoxicating liquors."

The other counts were in the same form but named other persons for whom the liquor was charged to have been stored, kept, and delivered. Defendant has appealed.

It is first contended that the indictment is bad because three several offenses, to-wit, storing, keeping and delivering are charged in the same count. This objection is not well taken.  [State v. Burns (Mo. Supreme Court), 140 S. W. 871; State v. Rawlings, 232 Mo. 544, 134 S. W. 530; State v. Currier & Moore; 225 Mo. 642, 125 S. W. 461.]

The next contention is that a demurrer to the testimony should have been sustained for the reason that the evidence discloses that defendant was a part owner of the liquor which he is charged to have stored, kept and delivered. The evidence was substantially as follows:

W. L. Hogle: "About as well as I remember Cliff (defendant) had given me a drink a time or two and I kinder thought I would reciprocate and I ordered a case of beer and I told him if he didn't care I would bring it down and we would drink it up and I sent it down there and we did. I don't think it was stored very long because other parties helped drink it and we drank it up." In explaining why he could not give the exact date of the transaction he said: "If you ordered a case of beer every week or so or two or three cases every week, you don't just know when you ordered it." He testified further as follows: Q. "Where was this beer placed?" A. "The best I remember we had it down in the cellar." Q. "What was done with the case?" A. "Well I think it went back perhaps with some of his empties. I never thought any more about the case. I got credit at Rolla so it went back some time. I don't know that he knows himself when it was shipped out. The drayman, as a rule, goes around here and picks up empties where he hauls them." He stated further that the beer was drunk by defendant and himself and such friends as either of them invited to help drink it.

George Elmer: Q. "Did you ever have any beer taken to the Commercial Hotel?" A. "I have been in on beer that was down there." Q. "Where was that beer kept?" A. "In the basement." Q. "What do you mean by being in on beer?" A. "Well, us fellows, we would pot our money and have it sent over." Q. "Who did you give the money to?" A. "Well I would give Cliff the money. I don't know when he would phone for some beer and he would or-

der it sometimes.'' Q. ''When he would order it where would.it come to?'' A. ''It would come to the depot, I guess.'' Q. ''And then it would be brought down to the Commercial Hotel?'' A. ''It would be down in the basement when I would see it.'' Q. ''When it was brought down to the hotel, would Cliff tell you that it was here?'' A. ''Some of the boys would come up and wise me up so I would go down. I was generally looking for it.'' Q. ''On this beer of yours that you helped drink down there, would Cliff go in and pot the money with you and others and order the beer?'' A. ''Yes, sir.'' Q. ''That is how it came to be taken there in his basement where you could all go to it?'' A. ''I guess so. There was no other place to take it. We had to take it somewhere.'' Q. ''How did you know who was in on it? Did you know who was was in on this, who was partners?'' A. ''Lots of the time we would take some of the boys down that wasn't in on it all.'' Q. ''Who did the beer belong to?'' A. ''I don't remember now. I have been in two or three times with fellows like that and I don't know who all it would be. Bert and I and Cliff went in by ourselves several times.'' Q. ''Who did the ordering?'' A. ''I suppose Cliff ordered it for us over the phone.''

Bert Organ: ''Had a couple of cases of beer down there before the hotel was started. Think I ordered it myself. It was shipped in my name, but Cliff was in on it. It was kept in the basement till we drank it up. Was in on a barrel and a case a time or two but don't remember the date or whose name it was shipped in. Gave Cliff the money once or twice. The barrel remained there three or four hours until we drank it up. There are 120 bottles in a barrel. Don't know how many paid on it. I think there were 15 or 20 of us drinking it.''

M. F. Roberts: ''Am sheriff of Dent county. Was in defendant's basement and found there a coun-

ter ten or twelve feet long standing three or four feet from the wall. This counter had a cupboard or locker in it which was locked. Defendant had the key and unlocked it and there were 102 pt. bottles of beer in it. Also found twenty-seven cases and four barrels filed with empty beer bottles and 275 empty pint beer bottles scattered around that were not in cases.'' He also found in the sample room of the hotel four trunks which appeared to be drummers trunks. Three of these were full of beer in bottles and the other one about one-half full. He estimated that there were 400 or 450 bottles of beer in the four trunks. When the sheriff asked defendant about these trunks he claimed they belonged to a drummer. The sheriff then asked him to bring the drummer to identify the trunks and that would settle it. Defendant said he didn't know where the drummer was and the sheriff then insisted that defendant open the trunks and threatened to break them open if he did not. Defendant then left the room and soon returned with a key and unlocked the trunks when they were found to contain beer as above stated.

Defendant testified in his own behalf and corroborated the witness Hogle as to the case of beer sent to his basement by Hogle then testified further that none of the other boys had any beer there in which he was not interested. Also Q. ''You would make up the money and one in the crowd would order the beer '' A. ''Yes, sir, and if it was several cases we would have it shipped in two or three of the boys names and if it was one case we would have it shipped in one fellow's name.'' Q. ''You remember the sheriff coming to the basement of the hotel there with you and looking at that 102 bottles?'' A. ''Yes, sir.'' Q. ''Do you remember who was in on that bunch of beer, who it belonged to?'' A. ''No, sir. I don't remember now. I cannot figure out any one batch of beer because we had too much over there.'' Q. ''Was you boys order-

ing and drinking beer over there all the time? A. "Yes, sir." Q. "There was about twenty-seven cases there, were all those cases that were stacked up there filled with empty bottles?" A. "No, sir. There was some of the cases wasn't full. There was enough cases or probably more to take up all those bottles because sometimes the boys would carry the beer away that belonged to them and fail to bring the bottles back." Q. "How long had those cases been accumulating in the cellar there?" A. "They had been accumulating ever since last fall. We would ship out some and some would come in and I would wait until I got a wagonload because the drayman would rather haul a wagonload. The boys were always very willing to order beer and have it there but when it came to picking up the empty bottles and putting them in the cases they wasn't there. I had to do it." On cross-examination he testified in part as follows: Q. "When was the first time, Cliff, that you boys made up any order for beer?" A. "About five years ago when the saloons closed." Q. "Since, I refer to the time since you went into the Commercial Hotel?" A. "It wasn't very long after I went in there. I don't remember when I did have the first beer. I got it in there all the time. We ordered beer in the basement there before I started the hotel." Q. "How much beer did you folks generally order, how many cases?" A. "All the way from one to ten. It depended on how big the crowd was." Q. "Did you have any occasion to order as many as twenty-eight cases?" A. "I think we ordered 20 once altogether and had it hauled." Defendant also said he kept the key to the locker in the counter in the basement and would sometimes go with the boys to get beer and drink it and sometimes would let them have the key and they would go. Also Q. "Did you take any account of it when they would come to you to get beer?" A. "No, sir. I wasn't in a crowd that I was afraid of." Q. "How

many parties was in on this?" A. "I cannot remember. I have no idea." Q. "Would you drink every time any one went down there?" A. "No, sir, not always. Sometimes I would drink by myself." Q. "How much did you have in the locker?" A. "O! we would fill it full and when it would get low we would fill it again." Q. "Was all this beer that you ordered shipped to you directly?" A. "All that I ordered?" Q. "Yes." A. You mean that the crowd was in on?" Q. "Yes." A. "Sometimes I would tell Strobach to ship so many cases to me and so many to some one else; we was all in on it and I did not want it all to come in my name."

The statute upon which this prosecution is based was enacted in 1907 and is in four sections which are now sections 7226-29, Statutes 1909. This prosecution is bottomed on section 7227 which is as follows: "No person shall keep, store or deliver for or to another person in any county that has adopted or may hereafter adopt the Local Option Law, any intoxicating liquors of any kind whatsoever. The next section of the act which is now section 7228, Statutes 1909, is as follows: "Nothing in the two next preceding sections shall be construed to prohibit any person from ordering liquor for his own or family use where such liquor is sent direct to the person using same."

It is now contended that a party who may be a part owner of the liquor comes within the exception in the last section above and since all the evidence shows defendant to have been a part owner of all the liquor he kept in his basement, he is not amenable to the statute and a verdict of acquittal should have been directed. In determining this question it is important to discover from the evidence the relation the defendant bore to the liquor and his purpose in connection therewith. The evidence all tends in one direction and when summarized shows the following condition to have existed. Local option had been

adopted in Salem and the saloons dispensed with some time before the transaction involved in this case. After the saloons were abolished several of the citizens who were unwilling to forego the pleasure of drinking liquor sought other means to supply their wants. Defendant, who was proprietor of the Commercial Hotel in Salem, came to the rescue of the thirsty and provided what, for all practical purposes, was a saloon in the basement of his hotel. A counter was placed therein with a cupboard or locker in the counter where beer in bottles could be kept and those wishing to drink beer could and did resort to this basement with their friends to gratify their desire for drink. The manner of procuring the beer was as follows: A number of persons, which always included defendant, would make up a certain sum of money and defendant would then order one or more cases of beer or a barrel and some cases as the occasion should require and the beer was placed in defendant's basement where he and the parties who contributed could go and take their friends and drink at will. Defendant according to his own testimony was careful to see that the supply was never exhausted for in answer to a question as to how much they had in the locker he said: "O! we would fill it full and when it would get low we would fill it again." Any man who had contributed toward the purchase of the liquor could go in and out at pleasure and take his friends with him and drink or take liquor away with him according to his own desire. Some idea of the continuity of the supply and the amount of drinking done in the basement may be gathered from the fact that when the sheriff went into the basement he found 102 bottles of beer in the locker, twenty-seven cases and four barrels filled with empty beer bottles and 275 empty beer bottles scattered around that were not in cases. In the sample room of the hotel were four trunks with 400 or more bottles of beer in them. No explanation as

to how this beer came to be there in those trunks is given but it was probably kept in reserve for the purpose of refilling the locker when the supply would get low so that a sufficient supply should be constantly on hand. The defendant tried to avoid opening the trunks and only did so after the sheriff had threatened to break them open if he did not. Defendant also testified that when the order for beer was large it would be shipped in the names of two or more persons because he did not want it all shipped in his name. The beer, however, all found its way to the defendant's basement and the empty cases were returned from there as they would be from an ordinary saloon.

On the above state of facts we are asked to hold that the conduct of defendant was innocent and not within the statute forbidding one to store or keep for or deliver to another intoxicating liquor. If the conduct of defendant was innocent and without any intention of violating the law and he was keeping the liquor for himself, merely, as the statute provides he may, why did he refuse to open the trunks and permit the sheriff to inspect their contents until coerced by the threat of the sheriff to break them open, and why would he divide up the order and ship part only in his own name and the remainder in the name of some other person? The defendant himself realized at the time that he was violating the law and if he was not it was not because his purpose was an innocent one but because he was mistaken in his judgment as to what would constitute a violation. It is contended that to come within the purview of this statute, the storing, keeping or delivering of liquor must be done to further sales in connection therewith. If it were done for that purpose it would clearly be within the statute (State v. Price, 229 Mo. 670, 129 S. W. 650; State v. Boehler, 148 Mo. App. 615, 128 S. W. 518), but it does not follow that the storing, keeping or delivering is

restricted under all circumstances to such as are con-
nected with illegal sales of liquor. The Local Option
Law, adopted in 1887, has for its declared purpose
the following: ''An act to provide for the preven-
tion of the evils of intemperance by local option, etc.''
The necessity for the adoption of the Local Option
Law rests upon the conviction of the people that with
an open saloon in the community, the evils of intem-
perance go to such length that in order to prevent
those evils, the saloon must be done away with. When
you disconnect the revenue to the municipality and
profit to the owner from the saloon, its relation to
the community becomes that, merely, of a place where
men congregate and drink liquor, and it is this prac-
tice that produces the evils of intemperance which
the adoption of the Local Option Law seeks to pre-
vent. It is apparent then that one of the ends sought
to be accomplished by the adoption of the Local Op-
tion Law is the abolition of the saloon as a place in
the community where men may congregate and drink
liquor. In our judgment, one of the purposes of the
statute now under consideration was to prevent the
very thing which this evidence shows was kept by this
defendant. The abolition of the saloon would be of
small value to the community in preventing the evils
of intemperance if a party could maintain a drinking
place on his premises where anybody and everybody
in the community who wanted a substitute for the
saloon could have their liquor kept until they and their
friends could drink it. This defendant seemed willing
to order and keep liquor for any and all comers who
wanted to use his basement as a drinking resort, and
by his own testimony it was the common practice to
keep it on hand all the time, and it would be a travesty
upon justice to say that a statute intended to prevent
that sort of thing could be evaded and made ineffec-
tual by the keep of a resort becoming a party to the
purchase of the liquor. As far as the evil sought to

be prevented is concerned it can make no difference that the defendant was a part owner of the liquor as long as he kept the liquor under his control and permitted the other part owners to come there at any time they wished and drink it and bring their friends there and permit them to drink it and also permit the parties to take away portions of it for their own use, for this sort of conduct is exactly what takes place in licensed dramshops. The only difference between the conduct of this defendant and that of a licensed dramshop keeper is that the dramshop keeper keeps for himself and sells to his customers and the drinkers pay the bar-tender for what they and their friends drink, while this defendant kept the liquor for the use of others and also for his own use but they go in and out of his basement at will and they and their friends drink there exactly as they do in a dramshop and if that thing is to be permitted, the effect upon the community is much the same as the effect of a licensed dramshop, and the community has gained little or nothing by voting the saloons out. It is clear to us that the conduct of this defendant as detailed by himself and other witnesses is clearly within the purview of the statute and the demurrer to the testimony was properly overruled.

Complaint is also lodged against the instructions. The court gave the following to which defendant objected and excepted. Number 5: "A person may, under the law, order beer for another but cannot keep and store it for him, and if you find from the evidence that the defendant made orders for beer for either of the witnesses, Hogle, Organ or Elmer, and after receiving it kept it stored in his cellar or basement for him (such witness) so that he (such witness) might go into the basement from time to time and get a bottle of the beer and drink it, this would be a keeping and storing of beer for such person as defined in those instructions and it would not make any difference in

such case if the defendant did have an interest in the case of beer in which the same was shipped and used and drank some of the beer himself that was shipped in the same case.''

Number 8: ''In order to convict on any count of the indictment in this case you must find that defendant kept and stored beer for the person named in the said count of the indictment. That he kept it stored in his cellar or basement and that he intended when he kept it so stored that such person might go into such basement either by himself or with defendant and get one or more bottles of such beer and drink it and that such witness would have the right to take some portion of the beer and appropriate it to his own use. It is not necessary to find that there was a distinct understanding as to how many bottles could be taken by such witness but if you find that there was an understanding between defendant and the witness that some of the bottles of beer might be appropriated by the witness to his own personal use and benefit and if the defendant kept it stored for the witness with such understanding, this would be a keeping and storing of such beer for such witness.''

Defendant asked and the court refused the following instruction: ''Although you may believe that defendant kept and stored beer for the witness as charged in the indictment yet if defendant was a part owner with the witness and others of said beer, then he had a right to keep and store the beer and you will acquit him.''

The instructions given as above set out, proceed upon the theory that if defendant ordered beer for the witnesses named in the indictment and after it was received, kept it for them with the understanding that the witness could go into the basement and drink or take away any of the bottles of beer that he might select then as to such beer the defendant would be storing and keeping it for the witness even though

State v. McMurtry.

defendant may have been a part owner of the case of beer of which the bottles taken or drank by the witness was a part. In other words, if the witness had an undivided interest in the beer, then as soon as he took to his own possession a specific part of the whole, it could then be said that defendant had stored or kept for the witness the specific part so appropriated by him. Whether or not this would be a correct theory in every case and under all circumstances we are clearly of the opinion that it was not erroneous as applied to the evidence in this case. It is apparent that the purpose of defendant was to maintain his basement as a drinking resort for all citizens of the city of Salem whom he was willing to trust and who wished to use it for that purpose. The only condition imposed was that he should be permitted to be counted as one of the crowd at all times. As explained before, his purpose was a guilty purpose as he understood it and there can be no question that his reason for always chipping in when the beer was to be paid for was because he thought it necessary for him to do so in order to evade responsibility under the law, the spirit of which he clearly felt he was violating.

It is suggested that if this defendant is guilty in this case and the instructions given correctly declare the law, then two or more persons cannot under any circumstances order liquor together for their own or family use and have it shipped in the name of one and received and kept by him until the division is made. Whether this statute applies to that state of facts we do not deem it necessary to decide in this case for that is not the fact in this case. The fact that this defendant had fitted up a counter in his basement with a locker and kept it full all the time with a reserve supply of 400 or more bottles concealed in drummers trunks in the sample room—the use of drummers trunks being, evidently, for the purpose

·of warding off suspicion—shows that, as far as this defendant was concerned under the facts in this case, his purpose was not primarily to secure beer for his own or his family's use but his real purpose was to. act as keeper of the liquor for others. While there is no direct evidence that defendant was making a profit in handling the liquor, yet, the trouble and expense he had gone to in preparing the counter and locker, his possession of the drummer's trunks, the manner in which the beer was handled and the circumstances surrounding the whole transaction point strongly in that direction. The profit may have come through the business of the hotel in increased patronage, but whether defendant was reaping a financial profit from the transaction or not it is clear upon the undisputed facts that his real purpose was to violate the law, and the fact that he had, technically, a legal interest in the beer should not be allowed to conceal his real purpose from the scrutiny of the law nor shield him from punishment for its violation. The judgment will be affirmed. *Nixon, P. J.,* concurs. *Gray, J.,* concurs in the result.

## CONCURRING OPINION.

GRAY, J.—On the authority of State v. Burns, 140 S. W. 871, the defendant's guilt was established by his own testimony. It is not claimed that in ordering the beer he did so in the name of all the persons who had contributed to the purchase fund, or that he notified the seller that such others were interested in the transaction. The Burns case holds that when one person purchases liquors for another, he must give to the seller the name of such other, and a failure so to do makes the order for the liquor an unlawful one, and the person acting for the true buyer guilty of unlawfully keeping such liquor all the time he has it in his possession.

In the Burns case, the defendant lived in Mt. Vernon, and was going to make a trip to another town. As he was about to start, his neighbor asked him to buy for him a pint of whiskey, and gave the defendant the money therefor. The defendant took the money, purchased the whiskey and brought it home with him and kept it in his house over night, intending to deliver it the next morning but before he did so he was arrested on a charge of unlawfully keeping intoxicating liquors.

The Supreme Court said that under such a state of facts the defendant was guilty, but if he had informed the seller that he wanted the whiskey for his neighbor and not for himself, he would have been innocent. In other words, if the defendant had said to the seller, "My name is Frank Burns. I live at Mt. Vernon, Mo., and have a dollar that was given to me by Mr. Alex Hixon, also of Mt. Vernon, Mo. This money was given to me by Mr. Hixon to purchase for him, the said Alex Hixon, one pint of whiskey. You will wrap up the whiskey and carefully mark the package for Mr. Alex Hixon, of Mt. Vernon, Mo., and make a note of the transaction," he would have been innocent.

The reason for this formality is given by the court in the following language: "The statute, however, contemplates, that the buyer shall deal in his own name with the seller, and that the seller shall send the whisky directly to the buyer, knowing to whom he is sending it. It is important that the transaction should be between the one who orders for his own use and the dealer who fills the order. Otherwise one could traffic in whisky in defiance of the statute by securing his customers and payment in advance, then buy the whisky in his own name, deliver it to his respective customers and, if charged under the statute, say, 'I was merely a messenger for persons who ordered for their own use.'"

Did the court mean to say that a person can solicit orders for intoxicating liquors from a large number of persons, and then take his conveyance and go to some other place where it is lawful to sell liquors, and hand the list of names to the seller and procure the goods thereon, and take the same and deliver them to the different persons and collect his commission and escape the penalty of the statute? If this is the law, then surely the "boot-legger" may carry on his odious and nefarious business at his will, and without fear of prosecution or punishment. It seems to me the court should look through the shadow into the substance and determine whether the act is criminal or innocent by its character, and not by the mere words used in performing it.

I think the defendant in the Burns case was innocent, if he acted in good faith and merely to accommodate his neighbor, whether he informed the seller of his agency or not. On the other hand, I believe he was guilty if he was really engaged in dealing in intoxicating liquors, and that it would have been no defense to prove that he told the seller he wanted the whiskey for his neighbor.

Under the statute, a druggist has the right to sell wine for sacramental purposes. Suppose the officers of a church desired wine for such purpose, and one of them applied to a druggist for wine, and the same was sold and delivered to him, but he failed to tell the druggist the names of the members of the congregation he was purchasing it for, would any court hold he was guilty of unlawfully storing and keeping intoxicating liquor during all the time he had the wine in his possession, and waiting for the time to arrive when it was to be used?

While Judge Cox in the majority opinion, justifying the action of the court in overruling the demurrer, has properly set out the testimony against the defendant in its strongest light, and has drawn all the infer-

ences that a jury would have a right to draw in favor
of the state, yet there are many circumstances which
tend to prove that the defendant was not guilty of any
intentional wrong, and many of the circumstances
pointed out by Judge Cox were denied by him or ex-
plained in a manner consistent with innocence, when
we leave out of consideration the Burns case.

The defendant testified, and was corroborated
by the state's witnesses, that from time to time, for
a period of two years, previous to his arrest, he and
his friends had made up a purse and sent to Rolla for
beer; that first one and then another attended to col-
lecting the fund and making the order. The different
names on the empty cases found in the basement at
the time of the arrest, were accounted for in this man-
ner, and fully corroborated the defendant's testimony.

The defendant also testified, and was not con-
tradicted, that the large number of empty bottles in
the basement was due to the fact that they were al-
lowed to accumulate for several months as the dray-
man would not come after them or the empty cases
until there was a sufficient quantity to justify the
special trip. The fact that the beer was kept locked
in the cupboard and trunks, was accounted for on
the theory that the boys had been missing some of
the bottles of beer, and they were satisfied that they
had been taken by persons who had no interest in
them, and therefore, they arranged to keep it locked,
so that no one, except the owners, could have access
to it. The large quantity of beer on hand was ac-
counted for by the defendant and the state's witnesses
also. The testimony showed that an order had been
made for beer, but the river between Rolla and Salem
had been up so as to prevent a delivery over a certain
route, and the boys made another order for eight
cases to be shipped by express and without cancelling
the first one. While the orders were made about ten
days apart, and the shipments were made at different

times, yet they both arrived about the same time, and the beer that came in the cases was taken out and put in the trunks and locked up, and a part of the empty cases found in the basement were the ones used in making these shipments, and from which the beer had been taken that was found in the trunks and locked.

The defendant testified that no one had been permitted to have any of the beer unless he was one of the common owners thereof, and it may be said that the state made no attempt to prove that any beer had been sold by the defendant to any one. The testimony wholly failed to show that the defendant had gone to any expense or trouble to procure the counter or cupboard that were found in the basement. In fact, it was not claimed by the state that the counter was not an old one that had been stored in the basement.

It is intimated in the majority opinion that the defendant might have been keeping the beer for the profit he was making on his boarders. The evidence discloses that but one boarder ever had any interest in the beer, and it seems to me that it is a far-fetched assumption to say that the defendant may have been engaged in a business that would render him liable to a fine and imprisonment for the profit he might realize from one boarder.

There was no real conflict in the testimony, and when the transactions are fairly considered, it may well be said that the defendant and his associates were doing what has often been done in all parts of the state, to-wit: Making up a purse and sending for beer, and having it delivered at some convenient place where the owners have access to it from time to time. I admit there were some inferences to the contrary, but the Constitution of this state guarantees to a citizen the right of trial by jury. As said by Judge Cox in Bank v. Redfearn, 141 Mo. App. 386, 125 S. W. 224: "The right of trial by jury is one of the sacred

institutions of our law, and it is the duty of the court to preserve it under all circumstances, and no matter how clear the testimony may be, or how strongly the court may be convinced that deception and fraud have been practiced, yet the law does not permit him to take from the jury the right of determining that matter.''

If the defendant's testimony was true, then when the boys were clubbing together and ordering the beer, and having it shipped and delivered at defendant's basement, and there used by them, their right to do so was expressly recognized by the highest judicial authority in this state. On the 30th day of June, 1910, the Supreme Court, in an opinion by Judge GANTT, and reported in 129 S. W. 650, construed the statute under which this defendant is prosecuted, and held that its provisions were limited to transactions by order houses. On May 17, 1910, the St. Louis Court of Appeals, in State v. Boehler, 148 Mo. App. 614, 128 S. W. 518, speaking through the presiding judge of that court, and construing the same statute, said: ''The obvious intent of section 2 is to prevent any person acting as a keeper of what were known as 'order houses.' ''

The witness, Bert Organ, on whose testimony the defendant was convicted, testified that in September, 1910, he and the defendant ordered, together, a case of beer; that by common consent it was delivered at the basement of the defendant's hotel, where it was kept until the owners drank it. Under the decision in the Burns case, this testimony justified the conviction in this case. Now it is perfectly clear that if the defendant or Organ had consulted any reputable attorney in this state, he would have been advised that there was no law in this state making such act a crime, and the attorney would have cited the decision of the Supreme Court as his authority.

While the Constitution of this state expressly provides that the Legislature shall not make an act an offense which was not at the time it was committed, yet the same thing is accomplished when a man does an act, the legality of which is expressly recognized by the Supreme Court at the time it is done, but afterward, such act becomes a crime because the Supreme Court has changed its decision.

The Legislature has the right to make it an offense to serve intoxicating liquors at a banquet, and it also has the right to make it an offense to serve the same at any social gathering, and further, to make it an offense for persons to club together and send and get intoxicating liquors for their own use, but in my judgment, the Legislature of this state has not made such acts a crime, and the courts are without power to legislate.

The Supreme Court of Kansas, has at all times, gone to the full length in upholding and affirming the judgment of the trial court assessing punishment on convictions for violating the prohibition laws of that state, and yet, during the present year, that court has held that where persons club together and order a keg or case of beer for their own use, they do not violate the letter or spirit of the Kansas prohibition law.

In People v. Peterson, 120 N. W. 570, the Supreme Court of Michigan considered a statute reading as follows: "It is a misdemeanor, punishable by fine or by imprisonment, for any person to himself, or by his clerk, agent or employee, directly or indirectly, manufacture, sell, keep for sale, give away, or furnish any vinous, malt, brewed, etc., liquors, or to keep a saloon or any other place where such liquors are manufactured, sold, stored for sale, given away, or furnished." The defendant had served bottles of beer to guests assembled at a surprise party at the defendant's home. In discharging the defendant, the Su-

preme Court said: ''The object of the act is to pro-
hibit the manufacture of, and all traffic in, liquors. It
cannot be reasonably construed so as to apply to the
individual use, or the keeping for use, of liquors by
citizens.''

It seems to me, if the defendant in good faith,
and without any intent to sell or to deal in the beer for
profit, ordered it in his own name, for the use only
of himself and his co-owners, that he was not guilty
of a crime. On the other hand, if he was using the
method simply as a means to defeat the law, then he
should be severely punished. I believe the court should
by proper instructions, lift the veil of formality and
permit the jury to pass upon the real character of
the defendant's conduct.

It has always been the practice in these liquor
cases, to submit to the jury the question whether the
defendant acted in good faith, or whether he employed
the means he used as a mere subterfuge for the pur-
pose of defeating the law. [State v. McCance, 110
Mo. 398, 19 S. W. 648; State ex rel. Bell v. St. Louis
Club, 125 Mo. 308, 28 S. W. 604; State v. Clow, 131
Mo. App. 548, 110 S. W. 632.]

Section 7215 of the Revised Statutes 1909, pro-
vides that any sale of intoxicating liquor made to a
minor, by any clerk of a dramshop keeper, shall be
deemed as the act of such dramshop keeper. Section
7213 makes it an offense to sell intoxicating liquors to
minors. Our Supreme Court long since held that it
is a defense for the dramshop keeper, where the sale
is made by his agent or clerk, to prove that it was
made in his absence and against his instructions given
in good faith. [State v. McCance, supra.] This is
based upon the universally recognized rule that the
letter of the statute must sometimes be cut down to
conform to its evident spirit and intent. [Kane v.
Railroad, 112 Mo. 34, 20 S. W. 532; Keeney v. McVoy,
206 Mo. 42, 103 S. W. 946.]

Guided by the above rules, it seems to me that notwithstanding the reading of the Act of 1907, that it is substantially complied with, when the person ordering the liquor, and to whom it was sent, was in good faith, one of the owners of it, and that it was not ordered or used by any persons except the owners of it.

While it is my duty, under the Constitution, to follow the Burns case, and while I shall do so in this case, and vote to affirm the judgment, I do not understand the Constitution requires me to say that the decision I am following is good law, when I do not believe it is.